**WYOMING OUTDOOR COORDINATING COUNCIL, et al., Plaintiffs.**

v.

**Earl L. BUTZ, in his official capacity as Secretary of the United States Department of Agriculture et al., Defendants.**

Civ. No. 5834.

United States District Court, D. Wyoming.

June 11, 1973.

Jack Speight, Cheyenne, Wyo., John R. Hursh, Riverton, Wyo., John D. Leshy and Toby Sherwood, Palo Alto, Cal., for plaintiffs.

Richard V. Thomas, U. S. Atty., D. Wyo., for defendants Earl L. Butz, John R. McGuire, Vernon O. Hamre and William J. Lucas.

Richard I. Leedy and James L. Hettinger, of Hettinger & Leedy, Riverton, Wyo., for defendant United States Plywood—Champion Papers, Inc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KERR, District Judge.

The Court having by its Order consolidated the hearing on the Application for the Preliminary Injunction with the trial on the merits, pursuant to the provisions of Rule 65(a)(2) of the Federal Rules of Civil Procedure, and having heard the testimony of the witnesses and received the exhibits offered into evidence, and having reviewed the files and records of the Court, enters its Findings of Fact Specially and its Conclusions of Law thereon in accordance with the provisions of Rule 52 of the Federal Rules of Civil Procedure as follows:

## FINDINGS OF FACT

This action was filed in the court on March 21, 1973, by the plaintiffs, Wyoming Outdoor Coordinating Council, David James Addy and D'Orr R. Merritt. A motion for temporary restraining order was filed on the same date, and on March 22, 1973, a Temporary Restraining Order was issued, setting the case for hearing on April 2, 1973. At the time the other pleadings were filed a Motion for Preliminary Injunction was filed. On April 2, 1973, a stipulation to continue the time for hearing on preliminary injunction and consenting to the extension of temporary restraining order was filed by the parties, pursuant to which the hearing on the motion for preliminary injunction was continued until April 20, 1973. On April 16, 1973, an Amended Complaint for Declaratory Injunctive Relief and Mandamus was filed, by which the Wyoming Wildlife Federation and the Wyoming Division

of the Izaak Walton League of America were added as parties. Due to an extremely severe storm occurring on April 19, 1973, the hearing in the case was continued until April 24, 1973, and on that date the Court entered its order consolidating the hearing on the Motion for Preliminary Injunction with the trial on the merits, and heard the evidence submitted by the parties on April 24, 25 and 26, 1973.

The plaintiffs brought the action seeking injunctive relief on the ground that the United States Forest Service of the United States Department of Agriculture had not complied with the National Environmental Policy Act in connection with two timber sales on the Teton National Forest within the District of Wyoming. Title 42 U.S.C. Section 4331 et seq. The failure to comply with the statute relied upon by the plaintiffs was the fact that an environmental impact statement was not filed and circulated by the Forest Service in connection with these timber sales. The concern of the plaintiffs is that the harvesting of the timber, and, more particularly, the construction of an access road to the timber sales sites with the accompanying additional access of larger numbers of people will have a deleterious effect upon an elk herd and some fisheries, and this is the significant impact upon the quality of the human environment which the plaintiffs seek to enjoin.

The Department of Agriculture and the United States Forest Service take the position that an environmental impact statement is necessary only if the action complained of is, first, a major federal action and is, second, one which has a significant impact upon the quality of the human environment. The Federal defendants contend that since this action was neither a major federal action nor one having a significant impact on the quality of the human environment it was appropriate to arrive, as the forest officials did, at a conclusion not to file an environmental impact statement, and that this decision if not arbitrary or capricious is in accordance with

law and the plaintiffs are entitled to no relief.

The defendant Champion International Corporation, as the successful purchaser of the timber sold, supports the position of the federal defendants but in addition contends that none of the plaintiffs have demonstrated any irreparable injury. It further relies upon its own potential damage, inter alia, and the public interest contends that in any balance of the equities the injunctive relief shown should not be afforded to the plaintiffs under the usual principles applied in a court of equity.

1. The plaintiff Wyoming Outdoor Coordinating Council is an association made up of about 3,000 members, belonging to some 12 different organizations, the largest of which is the Wyoming Wildlife Federation, made up of about 1,500 members. Plaintiff David James Addy is a commercial outfitter sponsoring big game hunts (primarily elk) in the Moccasin Basin and surrounding areas of the Teton National Forest, authorized to do so by a permit from the United States Forest Service. Plaintiff D'Orr R. Merritt is a commercial outfitter sponsoring big game hunts (primarily elk) on other nearby National Forest Land, authorized to do so by a permit from the United States Forest Service. The defendants, excepting Champion International Corporation, are all employees of the United States of America, administering authorized federal programs on the Teton or Shoshone National Forests in Wyoming.

2. On June 30, 1971, the Forest Service of the United States Department of Agriculture entered into a timber sale contract with Champion International Corporation, Contract Number 16–00338–6, in the Moccasin Basin area, in Region IV, Teton National Forest, Gros Ventre Ranger District, for the sale of an estimated 7,330 M.B.F. of timber.

3. On June 30, 1972, the Forest Service of the United States Department of Agriculture entered into a timber sale contract with Champion International Corporation, Contract Number 16–00363–4, in the Calf Creek-Papoose Creek area in Region IV, Teton National Forest, Gros Ventre Ranger District, for the sale of an estimated 8,410 M.B.F. of timber.

4. The timber in these sales consists of mature and overmature lodgepole and similar pine species, to be cut from 46 clearcuts involving a total of about 770 acres in a gross sale area of about 7,700 acres, and the sales will produce payments for stumpage to the United States totaling approximately $580,000.00.

5. The Calf Creek-Papoose Creek sale called for separated 22 clear-cutting units totaling 338 acres, and the Moccasin Basin sale called for a total of 24 separated clear-cutting units totaling 332 acres. Pursuant to the Multiple-Use Sustained-Yield Act, Title 16 U.S.C. Sections 528 et seq., a Forest Timber Management Plan was adopted for the Teton National Forest and approved in 1962.

6. The land area included in the timber sales does not contain a pristine forest. While classified by the Forest Service as a "roadless area", it is now, and has been for many years, traversed by "jeep roads". This area is also used by ranchers for the grazing of livestock, and for the hunting of elk by licensed outfitters, and others. The trees that are to be harvested are mature or overmature lodgepole and similar pine species.

7. The timber is located in forest land traversed by several jeep roads, which are used by the public for hunting and recreational purposes, and consequently the area does not constitute a large unroaded area in the sense the term is used in Section 1941.22 of the Forest Service Manual, even though it was included in the roadless area study conducted pursuant to Section 2321.31b of the Forest Service Manual. The logging access to the area is to be provided by the defendant Champion International Corporation, consisting of 2.81 miles of road running through the Shoshone National Forest from Wyoming Highway No. 287 to the Moccasin Basin sale area.

8. The area included in these sales is uninhabited except for various species of wildlife, four outfitter camps, and a number of elk.

9. Before each of the subject timber sales was made it was studied in the manner prescribed by the Forest Service Multiple Use planning procedure established pursuant to the Organic Act of 1897, 16 U.S.C. Sec. 475–476, and the Multiple-Use Sustained Yield Act of 1960, 16 U.S.C. Sec. 528 et seq., where the impact of the sale on the elk, as well as the other natural resources in the area, was considered, using an interdisciplinary method. Further, and as a part of the Forest Service resource short and long-term uses, the agency gave due consideration to the following: hunting, domestic livestock grazing, tourism, eye sores and erosion, soil stability, air quality, forest regeneration, fish habitat, fire hazards and control, water tables, climate, road construction and safety factors, vegetation, insects and disease, watershed conditions, outdoor recreation, range management, geology, and elk calving.

10. The Teton National Forest Multiple Use Plan was reviewed and accepted by representatives of the Wyoming Game and Fish Department and the Wyoming Outdoor Coordinating Council prior to its adoption in 1969.

11. In accordance with the plan adopted in 1962, the Moccasin Basin Timber Sale was proposed and a Stage 1 Multiple-Use Survey Report for the sale was prepared by the District Ranger on January 26, 1966.

12. Thereafter, the Beauty Park portion of the Moccasin Basin Timber Sale was combined with the Moccasin Basin Proposal and a Stage 1 Multiple-Use Survey Report was written on the combined sale on January 31, 1968.

13. On February 9, 1968, a long-range sale program for the Gros Ventre Ranger District of the Teton National Forest was submitted to the Supervisor's Office. This report included both the Moccasin Basin and the Calf Creek-Papoose Timber Sales, which at the time were divided into four sales.

14. In accordance with the 5-year action plan adopted in each National Forest, the Teton National Forest prepared a 5-year action plan designed to allow for the systematic approach to reconnaissance, environmental analysis, appraisal, road survey, and other sale preparation activity and to provide industry with a schedule of timber that will be available for harvest. These plans are public information.

15. The Moccasin Basin Timber Sale was placed in the Teton National Forest 5-year Timber Action Plan in 1967, and the Calf Creek-Papoose Timber Sale was added in 1969, and they appeared annually in the 5-year timber action plan thereafter until the sales were made and went to contract.

16. Both of these sales were publicly advertised for thirty days prior to the acceptance of any bids. With respect to the Moccasin Basin Sale, a Stage 1 Multiple-Use Survey Report first was prepared and approved in January and February, 1966. A Stage 1 Multiple-Use Survey Report on the Beauty Park Timber Sale was prepared and recommended in January of 1968. A Multiple-Use Survey Report Stage II then was prepared and approved in the months of February and March of 1970, but the approval was predicated on the condition that the sale be reviewed with the Wyoming Game & Fish Commission. An additional Multiple-Use Survey Report then was prepared and approved in the months of December 1970 and January 1971, which was ultimately approved on May 10, 1971. Prior to that time comments had been received from officials of the Wyoming Game and Fish Commission. An Environmental Impact Review for this timber sale was prepared in January of 1973, in which the conclusion was reached that "in view of the lack of significant effect on human environment and consideration given to wilderness management, * * * an environmental statement is not needed to

permit completion of the Moccasin Basin Timber Sale."

17. With respect to the Calf Creek-Papoose Creek Sale, a Multiple-Use Survey Report Stage I was prepared and approved in the months of February and March of 1970. An Environmental Analysis Report for this sale was prepared and approved in the months of April and May, 1972. In January of 1973, an Environmental Impact Review was prepared with respect to this sale, in which it was concluded that "in view of the lack of significant effect on human environment and consideration given to wilderness management, * * * an environmental statement is not needed to permit completion of the Calf Creek-Papoose Creek Timber Sale."

18. During 1969, a new Multiple-Use Plan for the Teton National Forest was prepared, which was a refinement of previous plans, and which continued as part of the plan both the Moccasin Basin Timber Sale and the Calf Creek-Papoose Creek Timber Sale. Public involvement was sought and obtained with respect to the 1969 revision of the Multiple-Use Plan.

19. It originally was planned that the road to service the Moccasin Basin Timber Sale would follow an existing road through Squaw Basin and across the Continental Divide into Beauty Park, which would have called for a road of some six miles. The first half of that would have roughly followed an existing jeep road. Because of objections which existed to that road, including objections by Champion International Corporation, a second road, 2.81 miles in length and entirely outside of the "roadless area", was planned to replace the Squaw Basin road which would be constructed on the Shoshone National Forest to gain access to these sales. An Environmental Analysis Report was prepared with respect to this road in February, and it was approved in March of 1973.

20. On March 8, 1973, Mr. James B. White, Director, Wyoming Game & Fish Department, advised that the Wyoming Game & Fish Department concurred with the decision to construct the second timber access road through the Shoshone National Forest to the timber sales on Moccasin Basin.

21. In connection with the timber sale road a good deal of dialogue was conducted, primarily with the Wyoming Game & Fish Commission and its representatives, who basically object to any road into the area, but felt that the shorter road in the new site would be the best of these alternatives.

22. The concern of the Wyoming Game & Fish Commission, and of the plaintiffs in this case, is the potential deleterious effect upon an elk herd in the Moccasin Basin, Calf Creek-Papoose Creek area. Experts testified that in connection with in-depth studies they previously had made of the effect of logging activities upon resident elk populations at other places, the conclusions of their studies were that there is no significant long-range effect, and that the only short-term effect is that the elk will stay approximately a half a mile away from the logging activities most of the time.

23. During the years 1972 and 1973, public input regarding the management of these areas and road construction into the timber sale areas was generated by the Forest Service in connection with the roadless area review and a proposed change in the location of the access road. In no case was there any significant controversy over the timber sales or the road.

24. The land involved in the timber sales was committed to sale prior to the time it was included in the roadless area study and to the enactment of the National Environmental Policy Act of January 1, 1970.

25. All of the unroaded study areas on the Teton National Forest were released from further study under the Section 2321.31b project referred to in paragraph 7 above, except two study areas. These two areas have been se-

lected for further study and are included among the 235 areas listed in the Environmental Impact Study filed by the Chief of the Forest Service with the Environmental Protection Agency on January 19, 1973. They are both many miles away from these sale areas.

26. The environmental impact of the subject roads and timber sales on the wilderness area and other values was considered by the Forest Service in conjunction with the provisions of the National Environmental Policy Act by assembling and reviewing the information compiled in the Multiple Use Management program. Based upon the information contained therein, a determination was made that the sale of this timber was not a major federal action and that it did not have a significant impact upon the quality of the human environment and that an environmental impact statement was not required to be filed. The administrative record introduced in this action is adequate, and supports the decision not to file an environmental impact statement; and that decision was not unreasonable in light of the facts and circumstances of this case.

27. Harvest of the subject timber will have no adverse effect on the livelihood of the elk herds. Additional roads into and around the subject timber sale areas will put additional hunting pressure on the resident elk herd, which can be adequately counteracted by licensing or other administrative measures of the Wyoming Game and Fish Department, and the road closures proposed by the Forest Service will lessen the impact of hunting on the resident elk to the extent that no irreparable damage will occur.

28. Both of these sales were part of a continual and ongoing sales program conducted within the Teton National Forest.

29. Champion International Corporation depends entirely upon timber sales from Federal land to sustain its current rate of operation, fixed at about 28 million board feet of logs annually. At its current rate of consumption, Champion will run out of saw logs in October of 1973 if the timber in the Moccasin Basin and the Calf Creek-Papoose Creek sales is not available before then.

30. Champion International Corporation owns and operates a sawmill at Dubois, Wyoming, and a planing mill at Riverton, Wyoming. The company is entirely dependent upon the sale of timber by the Forest Service to operate these mills for the manufacture and sale of 2 x 4 studs and for the sale of wood chips to a paper producer. Champion this year will process 28 million board feet of timber, more than half of which is contained in the two timber sales in question. While the Forest Service may offer for sale one more timber sale this year, of 4 million board feet, Champion has no alternate supply of timber. Champion will have processed all saw logs on hand by October of 1973, and without the two timber sales at issue, its two mills may have to be closed. Champion processes saw logs throughout the year, and has an average of, directly or indirectly, 216 employees.

31. Champion has a capital investment in Fremont County, Wyoming, of $500,000.00 book value, and an annual payroll in that county of $1,500,000.00. In 1972 the Chicago North Western Transportation Company was paid $950,000.00 by Champion to transport its timber products from Riverton, Wyoming, and in the event Champion's mills in Fremont County are closed, rail service to Riverton, Wyoming, would be greatly reduced, if not rendered completely unfeasible. Twenty-five percent of the stumpage price paid to the Forest Service is returned to Teton and Fremont Counties and used for the benefit of schools and roads, and this revenue may be lost. The parents of thirty-four percent of the children in the Dubois, Wyoming, schools are dependent upon the timber industry for their livelihood. These same parents contribute, through taxes, to the retirement of the bonded indebtedness of their school district in the amount of $449,000.00, and a $548,000.00 indebtedness of the Town of Dubois, Wyoming.

32. In context of the management of Teton National Forest, neither of these

sales constitutes a major federal action. There will be no significant effect upon the quality of the human environment arising out of either of these timber sales nor arising out of them collectively. The instructions of the Forest Service relative to environmental impact statements do not require environmental impact statements for sales executed prior to July 1, 1972.

33. The Forest Service properly concluded in this instance that no environmental impact statement need be filed, because it was not a major federal action having a significant effect upon the quality of the human environment.

34. Plaintiffs have failed to sustain the burden of proof that without relief they will suffer irreparable injury. The entry of a preliminary injunction would substantially harm the defendant Champion International Corporation and other parties interested in these proceedings, and public interest herein is best served by entry of judgment of this court in favor of the defendants and against the plaintiffs, and dissolving the temporary restraining order heretofore issued in this cause.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the subject matter of this action pursuant to the provisions of the Administrative Procedure Act, Title 5 U.S.C. Sections 701–706, and having jurisdiction for those purposes does not need to determine whether jurisdiction is properly founded under Title 28 U.S.C. Sections 1331 and 1361.

2. The National Environmental Policy Act, Title 42 U.S.C. Sections 1331 et seq. contemplates that there are some actions by administrative agencies which do not require the filing and circulation of an environmental impact statement, either because the action is not a major federal action, or because there is no significant effect on the quality of the human environment, and the administrative agency has authority to make its own threshold determination as to whether an environmental impact state-

ment is required considering these standards separately.

3. In ascertaining whether the determination by the Forest Service that an environmental impact statement was not required in this instance was proper, the standard of review to be applied in this court is whether that negative determination was arbitrary, capricious or an abuse of discretion, or otherwise not in accordance with law. The Court should determine whether the decision was based on a consideration of the relevant factors and whether there has occurred a clear error of judgment.

4. In cases in which the National Environmental Policy Act is sought to be applied to actions relating to the National Forests, the act must be considered in pari materia with other statutes relating to the National Forests, such as Title 16 U.S.C. Sections 475 and 476 and Title 16 U.S.C. Sections 528 et seq., popularly known as the Multiple Use Sustained Yield Act of 1960. The first cited statute provided initially for the establishment of National Forests to improve and protect the forest within the boundaries, and for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of the United States, and affording to the Secretary of Agriculture authority to sell trees found in the National Forests. Upon this initial statement of purpose then was added a policy of the Congress that the forest be administered for outdoor recreation, range, timber, watershed and wildlife and fish purposes.

5. The negative determination to the effect that an environmental impact statement was not required in this instance was in accordance with and did not violate any of the directives of the United States Forest Service or the Department of Agriculture or the National Environmental Protection Act.

6. On the basis of Findings of Fact entered herewith, the decision of the Forest Service of the Department of Agriculture that no environmental impact statement was required was based upon a consideration of the relevant factors,

did not result in any clear error of judgment, was not arbitrary or capricious or an abuse of discretion, and was in accordance with law.

7. The Council on Environmental Quality guidelines are advisory, and the Council on Environmental Quality does not have authority to prescribe regulations governing compliance with NEPA.

8. The Court having consolidated the hearing on the merits with the hearing on the Motion for Preliminary Injunction, pursuant to Rule 65(a)·(2) of the Federal Rules of Civil Procedure, the Court assumes for purposes of disposition of this case that, except to the extent they ·were admitted during the course of these proceedings, all of the defendants controvert and deny the material allegations of the Amended Complaint for Declaratory Judgment and Injunctive Relief and Mandamus, and no further answer or responsive pleading need be served and filed by any of the defendants.

9. Judgment will be entered dissolving the temporary restraining order dated March 22, 1973, and dismissing the Amended Complaint, together with the cause.