MINNESOTA PUBLIC INTEREST RE-
SEARCH GROUP, Appellee,

v.

Earl V. BUTZ, Individually, and as Secre-
tary of Agriculture, et al.,
Appellants.

Nos. 73-1242, 73-1280, 73-1281, 73-1282
and 73-1753.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 13, 1974.

Decided June 10, 1974.

**1316**

Curtis L. Roy, and Joe A. Walters, Minneapolis, Minn., for appellants.

Gerald L. Seck, Minneapolis, Minn., for appellee.

Before MEHAFFY, Chief Judge, and GIBSON, LAY, HEANEY, BRIGHT, ROSS, STEPHENSON, and WEBSTER, Circuit Judges, *en banc*.

GIBSON, Circuit Judge.

The plaintiff, Minnesota Public Interest Research Group (MPIRG), filed a complaint asking for declaratory and injunctive relief against further logging in the Boundary Waters Canoe Area (BWCA). It also requested application of the Wilderness Preservation System Act of 1964,[1] to the management policies of, and to the existing contracts for timber cutting executed by, the United States Forest Service in the BWCA.

The District Court, after a hearing on the merits, enjoined the defendants from logging "in those areas of the active timber sales on the BWCA which are contiguous with the main virgin forest areas of the BWCA pending the Forest Service's completion of its new BWCA Management Plan and accompanying impact statement."[2]

Crucial to our determination of the issue raised is whether or not the modification of existing contracts for cutting of virgin timber, the extension of some of these contracts, and the supervision of the day-to-day activities in the operation of the timber cutting contracts in the BWCA area constitute major federal action significantly affecting the quality of the human environment within the purview of the National Environmental Policy Act of 1969.[3]

A further issue held in abeyance by the court is whether the Wilderness Act precludes the Forest Service from allowing any logging operations at all in the BWCA. The District Court, after a plenary hearing, felt that the Forest Service possibly would, in reviewing its entire management policy, forego or prohibit the cutting of timber in the BWCA area, thus mooting this issue; and if not, the court reserved jurisdiction to pass upon the legal issue of whether the Wilderness Act precludes timber cutting and logging activities in the wilderness area of the BWCA.

The BWAC, located in northern Minnesota, is a unique natural resource with some 1,060,000 acres of lakes, streams, and timber, which along with the adjoining Canadian Quetico-Superior forest forms the only canoe wilderness area in the world. The area contains more than 1,000 lakes larger than 10 acres, either connected by streams or convenient portages that allow for easy canoe travel through the wilderness area.

The BWCA is administered by the United States Forest Service as a Wilderness Area and as a part of the Superior National Forest. The Draft Management Plan of the Forest Service for the BWCA refers to the area as "unique, pristine, endangered, rugged, primitive, beautiful and fragile." Highly prized by many, including plaintiff

---

1. The BWCA has been designated a Wilderness Area pursuant to the National Wilderness Preservation System Act (The Wilderness Act), 16 U.S.C. § 1131 et seq.

2. Minnesota Public Interest Research Group v. Butz, 358 F.Supp. 584, 630 (D.Minn.

1973). The Honorable Miles Lord, United States District Judge, District of Minnesota.

3. 42 U.S.C. § 4321 et seq., effective January 1, 1970 (NEPA).

MPIRG, the Wilderness Area affords recreational, scientific, and educational opportunities. It is also highly regarded by others, like the defendant paper and logging companies, who value the thousands of acres of marketable timber it contains.

This lawsuit was commenced November 24, 1972, by MPIRG, an association of students at various Minnesota colleges and universities. MPIRG requested a temporary and permanent injunction against any further logging in the BWCA until the Forest Service completes an Environmental Impact Statement (EIS) complying with the requirements of NEPA. There was a separate claim that logging activities should be banned in the BWCA as incompatible with the wilderness values protected by the Wilderness Act.

The defendants [4] assert that there has been no major federal action since the effective date of NEPA (January 1, 1970), and further, that MPIRG lacks standing and is guilty of laches. They also argue that logging is specifically provided for in the BWCA by the Wilderness Act. The District Court found that there was major federal action and that MPIRG has standing and was not guilty of laches.

These appeals present a question of the applicability of NEPA to private logging operations carried out pursuant to pre-NEPA Forest Service timber sales within the BWCA. Specifically in question is § 102(2)(C) of NEPA [5] that requires the preparation of an EIS for "major Federal actions significantly affecting the quality of the human environment * * *." Should this court affirm the District Court's determination that the Forest Service's actions regarding these timber sales after January 1, 1970, constitute major federal action significantly affecting the quality of the human environment, a further question as to the propriety of the District Court's temporary injunction pending the preparation and filing of the final EIS is presented.

The Superior National Forest contains approximately 3 million acres, some 1,060,000 of which are included in the BWCA. Pursuant to a regulation of the Secretary of Agriculture,[6] the BWCA has been divided into two zones, an Interior Zone of some 640,000 acres [7] in which timber cutting is not allowed, and a Portal Zone of about 425,000 acres in which timber cutting has been allowed. At the time of suit 11 timber sales were active within the BWCA,[8] consisting of

---

4. The Government defendants are Earl Butz, Secretary of Agriculture; John McGuire, Chief, United States Forest Service; Jay Cravens, Regional Forester, and Harold Anderson, Supervisor, Superior National Forest. Private defendants are Consolidated Papers, Inc.; The Northwest Paper Company; Northern Forest Products, Ltd.; Kainz Logging Company; Emil Abramson; and Boise Cascade Corporation. The private defendants are the owners of the 11 timber sales active at the time suit was filed.

5. 42 U.S.C. § 4332(2)(C).

6. 36 C.F.R. § 251.85 (1971).

7. Included in this total is 100,000 acres to be added in 1975. Portions of this 1975 addition were included within the 11 timber sales active at time of suit.

8. Those 11 sales, the rights to remove timber during the period of the contract, are as follows:

1. Shell Lake Sale, purchased September 24, 1968, original termination date June 30, 1972 extended to June 30, 1973.
2. Sunnydale Sale, purchased March 28, 1968, termination date June 30, 1978.
3. Jerry Creek Sale, purchased April 7, 1964, original termination date March 20, 1969, extended once to March 31, 1971, and again to March 31, 1974.
4. Beartrap Sale, purchased December 30, 1968, termination date December 31, 1973.
5. Old Road Sale, purchased July 26, 1966, original termination date June 30, 1971, extended to June 30, 1973.
6. Trail Block Sale, purchased March 3, 1969, termination date March 31, 1973.
7. Compartment 38 Block Sale, purchased January 16, 1968, termination date March 31, 1973.
8. East Road Block Sale, purchased January 3, 1967, original termination date December 30, 1971, extended to June 30, 1974.
9. West Tofte Sale, purchased July 13, 1959, original termination date August 15, 1969, extended to June 30, 1974.

29,261 acres, on which 5,275 acres remained uncut. These sales had all been made during the period 1959 through 1969, prior to the January 1, 1970, effective date of NEPA.

Timber harvesting has been a source of public controversy surrounding the BWCA. In November, 1971, soon after its formation, MPIRG requested the Forest Service to prepare an EIS considering the effects of logging in the BWCA and to halt all logging in the BWCA until the statement was completed. MPIRG was informed that a new BWCA management plan was under consideration and that the EIS being prepared in conjunction with the new plan would be ready in April, 1972. This date was later changed to April, 1973, but to satisfy MPIRG's objections a preliminary environmental analysis covering logging was to be made available in August, 1972, for public review. Dissatisfied with this preliminary analysis, MPIRG attempted again to have the Forest Service suspend logging in the BWCA until the EIS was filed and also requested the Forest Service to compensate the private defendants with timber outside the BWCA. This suggestion was rejected by the Forest Service on November 15, 1972, and MPIRG filed this suit on November 24, 1972.

The activities of the Forest Service concerning these 11 pre-NEPA timber sales fall roughly into three categories —contract extensions, contract modifications, and the administrative actions required by the contracts.

On six of these sales,[9] the Forest Service after January 1, 1970, entered into contract extensions which gave the owners additional time to complete cutting on the sales. There was no obligation on the part of the Forest Service to grant these extensions; the testimony indicated that this was a "routine" practice of the Service, prompted perhaps in part by its knowledge that the original contract periods were not normally expected to afford sufficient time to complete the cutting.

Modifications, changes in the land area in which logging could occur, were negotiated by the Forest Service in 7 of the sales contracts after January 1, 1970.[10] Many of these modifications were made for "environmental" reasons. This is some indication that the Forest Service recognized that these timber sales could have a significant impact on the BWCA. Further, the administration of the timber sales contracts required the continual involvement of Forest Service personnel in approving locations for logging roads, logging camps, the marking of sale boundaries on the ground, approving the use of mechanized equipment, and the making of various other approvals and agreements.

No environmental impact statements have been prepared for any of the sales, whether unchanged, modified, or extended after January 1, 1970.[11] The position of the Forest Service, adopted by the private defendants in this action, is that there has been no major federal action since the effective date of NEPA. The District Court held otherwise [12] and

10. East Tofte Sale, purchased November 30, 1961, original termination date March 20, 1972, extended to June 30, 1974.

11. Black Spruce Sale, purchased December 22, 1969, original termination date December 31, 1972, extended to June 30, 1973.

9. Shell Lake, Jerry Creek, Old Road, East Road Block, East Tofte, and Black Spruce Sales.

10. Shell Lake, Sunnydale, Beartrap, Old Road, East Road Block, East Tofte, and Black Spruce Sales.

11. "Environmental analyses" were prepared in conjunction with the extensions of the Shell Lake, East Road Block, and East

Tofte Sales. These analyses briefly lay out environmental factors considered in granting an extension and were not intended to be the detailed EIS required by NEPA.

12. "It is the Court's conclusion that the cumulative effect of the administrative actions of the Forest Service taken since January 1, 1970 in regard to timber sales in the BWCA constitute major federal actions that have had and continue to have a significant effect on the human environment. Therefore, an impact statement should have been prepared by the Forest Service on the management policy dictating such administrative actions." 358 F.Supp. at 622.

enjoined timber cutting on all or portions of seven of the timber sales in question.[13]

## I. MAJOR FEDERAL ACTION

Does the Forest Service's involvement in these timber sales constitute major federal action significantly affecting the quality of the human environment? Section 102(2)(C) requires preparation of an EIS for "every recommendation or report on proposals for legislation *and other major Federal actions* significantly affecting the quality of the human environment." (emphasis added). What constitutes other major federal action is not defined in the Act, nor is the legislative history very illuminating.[14] S.Rep.No. 91–296 in discussing Section 102(2)(C) states:

> (c) Each agency which proposes any major actions, such as project proposals, proposals for new legislation, regulations, policy statements, or expansion or revision of ongoing programs, shall make a determination as to whether the proposal would have a significant effect on the quality of the human environment. If the proposal is considered to have such an effect, then the recommendation or report supporting the proposal must include \* \* \* [those findings required by § 102(2)(C)].

The threshold question as to whether there is a major federal action requiring NEPA compliance is not presented in the majority of cases; there is little question that when the federal government commits millions of dollars to build dams, nuclear power plants, or highways that there is a major federal action. The question presented by the instant case is not so clear-cut; these actions of the Forest Service cannot be quantified in terms of dollars to be spent or tons of earth to be moved.

### A. Review of NEPA Applicability

■ First, we are faced with the Forest Service's determination that there has been no major federal action. It is generally accepted that the involved federal agency has the responsibility of making the threshold determination as to the applicability of NEPA.[15] What standard of review should be applied in determining whether this initial determination comports with the requirements of the Act? The District Court determined that the Forest Service's refusal to prepare an EIS was "arbitrary, capricious and unlawful." [16]

This is the standard this circuit has adopted in reviewing a substantive decision to proceed with a project after the agency has prepared an adequate EIS considering the environmental effects. Environmental Defense Fund v. Corps of Engineers, 470 F.2d 289, 300 (8th Cir. 1972), cert. denied, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973). *See also*, Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Jicarilla Apache Tribe of Indians v. Morton, 471 F.2d 1275, 1281 (9th Cir. 1973); Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1115 (1971). The defendants argue that this standard should be applied to the threshold determination of the applicability of NEPA.

The Second Circuit, in Hanly v. Kleindienst, 471 F.2d 823, 829–830 (2d Cir. 1972), cert. denied, 412 U.S. 908, 93 S.

13. Cutting was enjoined on the Shell Lake, Sunnydale, Jerry Creek, Beartrap, Old Road, West Tofte, and East Tofte Sales. The District Court allowed cutting to continue on the remaining sales as they were surrounded by areas that had been previously logged and represented no further intrusion into virgin forest.

14. See H.R.Rep.No. 91–378, 91st Cong., 1st Sess., 2 U.S.Code Cong. & Admin.News, 2751, 2769 (1969); S.Rep.No. 91–296, 91st Cong., 1st Sess. (1969).

15. *See, e.g.*, Wyoming Outdoor Coordinating Council v. Butz, 484 F.2d 1244, 1249 (10th Cir. 1973); Save Our Ten Acres v. Kreger, 472 F.2d 463, 464 (5th Cir. 1973); Hanly v. Mitchell, 460 F.2d 640, 644 (2d Cir.), cert. denied, 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972) (*Hanly I*).

16. 358 F.Supp. at 624.

Ct. 2290, 36 L.Ed.2d 974 (1973) (*Hanly II*), has adopted this standard of review of the agency's threshold determination. However, two other circuits, the Fifth and Tenth, have determinated that the initial determination is to be tested under a rule of reasonableness like that set forth in *Overton Park*.[17] Wyoming Outdoor Coordinating Council v. Butz, 484 F.2d 1244, 1249 (10th Cir. 1973); Save Our Ten Acres v. Kreger, 472 F.2d 463, 465–466 (5th Cir. 1973).

NEPA is not only an environmental full-disclosure law, but was also intended to effectuate substantive changes in decision making. Environmental Defense Fund v. Corps of Engineers, *supra* at 297. We are primarily concerned here with the action-forcing provisions of Sec. 102(2)(C), for without the full disclosure required by NEPA for major federal actions, there exists no sound basis to evaluate the environmental aspects of a project. And without this basis for evaluation, the is no way to determine whether a substantive decision to proceed is arbitrary and capricious.

■ Section 102(1) of the Act contains a Congressional direction that environmental factors be considered "to the fullest extent possible." An initial decision not to prepare an EIS precludes the full consideration directed by Congress. In view of the concern for environmental disclosure present in NEPA, the agency's discretion as to whether an impact statement is required is properly exercised only within narrow bounds. Action which could have a significant effect on the environment should be covered by an impact statement.[18] We think that the threshold decision as to whether or not to prepare an EIS should be reviewed not on the arbitrary and capricious standard used to test a substantive decision which entails a balancing and weighing of alternatives already studied, but on the grounds of its reasonableness.

■ An agency decision concerning NEPA requirements is not one committed to the agency's discretion by law within the meaning of the APA, 5 U.S.C. § 701 et seq.[19] The Congressional command that agencies cooperate in attaining the goals of NEPA "to the fullest extent possible" requires the courts to look at the good faith efforts of the agency to comply. To upset an agency determination not to prepare an impact statement, it still must be shown that the agency's determination was not reasonable under the circumstances. This will require a showing that the project could significantly affect the quality of the human environment. Save Our Ten Acres v. Kreger, *supra* at 466. We therefore hold that review of an agency's determination not to prepare an impact statement should be measured by its reasonableness in the circumstances, not as to whether it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.[20]

---

17. The Court stated:
 Also involved in this initial inquiry is a determination of whether on the facts the Secretary's decision can *reasonably* be said to be within that range * * * [of discretion vested by the Act]. (emphasis supplied).
 Citizens to Preserve Overton Park v. Volpe, *supra* at 416. The Act involved in *Overton Park* was Sec. 4(f) of the Department of Transportation Act, 49 U.S.C. § 1653(f).

18. This is basically the position taken by the Council on Environmental Quality (CEQ). *See*, CEQ Guidelines, 36 Fed.Reg. 7724 (April 23, 1971), which provides in Sec. 5(b):
 The lead agency should prepare an impact statement if it is reasonable to anticipate a cumulatively significant impact on the environment from federal action.

19. *See* Wyoming Outdoor Coordinating Council v. Butz, *supra* at 1249; *cf. Hanly II, supra* at 829.

20. In this regard it should also be noted that the Second Circuit, even though adopting the arbitrary and capricious standard of review, requires that the agency develop a reviewable environmental record when making its threshold determination of the applicability of NEPA. *Hanly I, supra* at 647. *See also,* Arizona Public Service Co. v. Federal Power Commission, 483 F.2d 1275, 1282 (D.C.Cir. 1973). *Hanly II* goes further and requires the agency to give public notice of the action and provide an opportunity to submit facts

*B. Was The Forest Service Determination Reasonable?*

The CEQ Guidelines state:

5. *Actions included.*

\*　\*　\*　\*　\*　\*

(b) The statutory clause "major Federal actions significantly affecting the quality of the human environment" is to be construed by agencies with a view to the overall, cumulative impact of the action proposed (and of further actions contemplated). Such actions may be localized in their impact, but if there is potential that the environment may be significantly affected, the statement is to be prepared. \*　\*　\* In considering what constitutes major action significantly affecting the environment, agencies should bear in mind that the effect of many Federal decisions about a project or complex of projects can be individually limited but cumulatively considerable.[21]

The Guidelines further provide:

11. *Application of section 102(2)(C) procedure to existing projects and programs.* To the maximum extent practicable the section 102(2)(C) procedure should be applied to further major Federal actions having a significant effect on the environment even though they arise from projects or programs initiated prior to enactment of the Act on January 1, 1970.[22]

The defendants argue that the actions of the Forest Service must be isolated from the subsequent impact on the environment from logging operations. They assert that the statutory phrase "major Federal action significantly affecting the quality of the human environment" creates two tests. First, it must be determined whether there is a major federal action; next, if there is a major action, the impact of that action on the environment must be determined. This interpretation was adopted in *Hanly I, supra* at 644.

Defendants claim that the term "major Federal action" refers to the cost of the project, the amount of planning that preceded it, and the time required to complete it, but does not refer to the impact of the project on the environment. We agree with defendants that the two concepts are different \*　\*　\*.

*Accord*, Julis v. City of Cedar Rapids, Iowa, 349 F.Supp. 88 (N.D.Iowa 1972). *But cf.* Wyoming Outdoor Coordinating Council v. Butz, *supra*, rev'g 359 F.Supp. 1178 (D.Wyo.1973) (which adopted the *Hanly I* rationale); Environmental Defense Fund v. Tennessee Valley Authority, 468 F.2d 1164 (6th Cir. 1972).[23]

To separate the consideration of the magnitude of federal action from its impact on the environment does little to foster the purposes of the Act, *i. e.,* to "attain the widest range of beneficial uses of the environment without degradation, risk to health and safety, or other undesirable and unintended consequences."[24] By bifurcating the statutory language, it would be possible to speak of a "minor federal action sig-

---

bearing upon the determination. *Hanly II, supra* at 836.

21. Revised Guidelines were issued by the CEQ, August 1, 1973. 38 Fed.Reg. 20549. Sec. 5, although renumbered to § 1500.6 remains substantially the same.

22. Sec. 11 was altered by the Revised Guidelines to make clear the applicability of NEPA to projects initiated before its effective date. Added in § 1500.13 was the following:

Agencies have an obligation to reassess ongoing projects and programs in order to avoid or minimize adverse environmental effects. \*　\*　\* While the status of the work and degree of completion may be considered in determining whether to proceed with the project, it is essential that the environmental impacts of proceeding are reassessed *pursuant to the Act's policies and procedures* \*　\*　\*. (emphasis supplied).

23. *See also*, Virginians for Dulles v. Volpe, 344 F.Supp. 573 (E.D.Va.1972); Conservation Society of Southern Vermont, Inc. v. Volpe, 343 F.Supp. 761 (D.Vt.1972); Citizens for Reid State Park v. Laird, 336 F. Supp. 783 (D.Me.1972).

24. Sec. 101(b)(3), 42 U.S.C. § 4331(b)(3).

nificantly affecting the quality of the human environment," and to hold NEPA inapplicable to such an action. Yet if the action has a significant effect, it is the intent of NEPA that it should be the subject of the detailed consideration mandated by NEPA; the activities of federal agencies cannot be isolated from their impact upon the environment. This approach is more consonant with the purpose of NEPA and is supported in S.Rep.No.91–296, *supra,* and the CEQ Guidelines.

■■■ Looking now to the timber sales in question, it was established in the District Court that there is a significant effect on the BWCA from these logging operations. These effects are fully detailed in the opinion of the District Court.[25] However, defendants contend that any adverse effect on the BWCA does not "significantly affect the quality of the *human* environment" as there is no evidence showing that human users of the BWCA have even seen a timber sale. This appears to be a too restrictive view of what significantly affects the human environment. We think NEPA is concerned with indirect effects as well as direct effects. There has been increasing recognition that man and all other life on this earth may be significantly affected by actions which on the surface appear insignificant. This has received recognition by the CEQ; "the effect of many Federal decisions about a project * * * can be individually limited but cumulatively considerable."[26] Apart from what may be referred to as "existence value,"[27] the evidence indicated that there are direct effects on the human environment from logging. Logging creates excess nutrient run-off which causes algal growth in the lakes and streams, affecting water purity. Logging roads may cause erosion and water pollution and remain visible for as long as 100 years; this affects the rustic, natural beauty of the BWCA, recognized as unique by the Forest Service itself.[28] Logging destroys virgin forest, not only for recreational use, but for scientific and educational purposes as well. All these are significant impacts on the *human* environment.

The Forest Service has been significantly involved with these timber sales since January 1, 1970, the effective date of NEPA. Its contracts require it to, *inter alia,* approve locations of timber roads, logging camps and buildings; mark the trees to be cut; and negotiate payment for the timber cut. In addition, it extended six of the sales after the effective date of NEPA and made contract modifications with the consent of the purchasers on seven of the sales.

■■■ Further, there is a monetary involvement. The District Court found that the revenue the Forest Service receives from its timber sales in the BWCA is clearly inadequate to finance

25. 358 F.Supp. at 609–617.

26. CEQ Guidelines, Sec. 5.

27. Existence value refers to that feeling some people have just knowing that somewhere there remains a true wilderness untouched by human hands, such as the feeling of loss people might feel upon the extinction of the whooping crane even though they had never seen one. *See,* Conservation Society of Southern Vermont, Inc. v. Volpe, *supra* at 767–768:

> To those of us who are so fortunate to live in Vermont and to have a little wildness surrounding us, it is probably not so difficult as it may be for others to conceive in terms of the preservation of all mankind of the importance of a little limestone hill rising abruptly from a valley floor, covered with basil and marjoram and creeping thyme, with columbine and yellow ragwort in dramatic abundance. The more so any of us find it difficult to conceive of the lasting, indeed the underlying importance of wetlands or bogs—perhaps because understandably we do not recognize, or we wish to forget, our own insignificant beginnings in what Judge Learned Hand called the "primordial ooze." (footnote omitted).

28. While perhaps accurate, as the defendants argue, that none of the plaintiff members of MPIRG have ever seen a timber sale, defendants also assert that the greatest number of recreational users use areas which have been previously logged. This would indicate that the effects of logging are visible to many BWCA users.

the reforestation program required after the mature timber is cut. This financial involvement is properly considered when determining the significance of Forest Service participation. Defendants' argument that because the Forest Service was contractually committed to these actions they cannot be major federal actions is unpersuasive. These actions were as significant in the context of these timber sales as was the approval of a right-of-way and coal stack heights found to be major federal action in Jicarilla Apache Tribe of Indians v. Morton, *supra,* and the clear-cutting of some 670 acres of timber pursuant to Forest Service sales found to be major federal action in *Wyoming Outdoor Coordinating Council v. Butz, supra.* We agree with the District Court that there is "major Federal action significantly affecting the quality of the human environment" and an impact statement is required.[29]

## II. PROPRIETY OF THE INJUNCTION

Upon determining that NEPA was violated, the District Court enjoined timber cutting on all or part of seven active timber sales until the required EIS was prepared and filed. The private defendants argue that an injunction should not have been granted. In addition, in No. 73–1753, Consolidated Papers appeals the District Court's refusal to dissolve the injunction upon its later motion.

Defendants do not challenge the power of the District Court to enjoin activities pending the filing of an EIS; it is clear

that the District Court does have that power. Bradford Township v. Illinois State Toll Highway Authority, 463 F.2d 537, 539 (7th Cir.), cert. denied, 409 U. S. 1047, 93 S.Ct. 518, 34 L.Ed.2d 499 (1972). *Cf.* Silva v. Romney, 473 F. 2d 287 (1st Cir. 1973). The question then is whether the District Court abused its discretion in granting the temporary injunction. Yakus v. United States, 321 U.S. 414, 440, 64 S.Ct. 660, 88 L.Ed. 834 (1944); E. W. Bliss Co. v. Struthers-Dunn, Inc., 408 F.2d 1108, 1113 (8th Cir. 1969); 7 Moore's Federal Practice ¶ 65.04 [2] (2d ed. 1974).

■ We find no abuse of discretion here. Plaintiff established a violation of NEPA. If the cutting were allowed to continue pending preparation of the EIS regarding the effects of logging, the District Court would have been engaging in an exercise in futility, because any damage that might have been avoided after study would have irreversibly occurred. The District Court weighed the possible damage to each defendant from granting the injunction and concluded that whatever harm suffered would be slight. On balance, it appears to us that the District Court properly exercised its discretion to maintain the status quo pending the preparation and filing of the necessary EIS.

■ After the Forest Service announced the filing of a draft EIS covering the draft BWCA Management Plan, which would continue to allow timber cutting, Consolidated Papers moved the court to lift its injunction on the Old Road Sale, asserting that the equities

---

29. The Forest Service contemplates that the impact statement to be filed will cover all facets of their new BWCA Management Plan, including the Forest Service policy on timber cutting. We are of the view that upon consideration of the overall timber management policy of the Forest Service in an EIS complying with NEPA, each administrative action taken pursuant to that policy will not require a separate impact statement. In other words, if the environmental effects of timber cutting are considered in the overall EIS, an individual EIS for each timber sale would not be required, absent a material

change in circumstances or a departure from the policy covered in the overall EIS. The requirements of NEPA are not meant to leave an agency without any discretion in fulfilling its responsibilities. "NEPA is not a paper tiger, but neither is it a straitjacket." Scientists' Institute for Public Information, Inc. v. Atomic Energy Commission, 481 F.2d 1079, 1091–1092 (D.C.Cir. 1973).

By the above statement, we intimate no opinion as to whether or not the Forest Service in discharging its statutory responsibilities will permit timber cutting as part of its new BWCA Management Plan.

had been substantially altered. This motion was denied by an order of October 9, 1973. Consolidated argues that since the probability that the Forest Service would prohibit further logging in the BWCA was a factor in the District Court's initial grant of injunctive relief, the fact that logging is not to be prohibited requires the dissolution of the injunction.

We cannot agree. The District Court's injunction is conditioned upon the Forest Service's compliance with NEPA. Compliance has not been made until the Forest Service prepares and files a final EIS assessing the impact of logging upon the environment.

> [A] draft statement is not the basis of an agency decision. Its function is to elicit comment that will contribute to a final statement, and it is the final statement that is supposed to serve as the basis for agency assessment of the environmental implications of the project.

Sierra Club v. Mason, 365 F.Supp. 47 (D.Conn.1973).

Until the final statement has been filed it would only serve to give a judicial recognition to the "futility" of the NEPA process if the District Court dissolved its injunction on the basis of the draft statement. That would constitute an admission that the final decision has already been made without consideration of the public reaction and comments to the draft statement. Although such may be the reality, it should not be the appearance of the NEPA review process. There was no abuse of discretion in refusing to dissolve the injunction.

## III. LACHES

■ Defendants also argue that MPIRG is guilty of laches. This doctrine, while recognized as available, has received a lukewarm reception in suits presenting environmental questions, for not only will others than the plaintiff suffer the possible adverse environmental effects, but the agency will escape compliance with NEPA, a result not to be encouraged. *See,* Environmental Defense Fund v. T.V.A., *supra* at 1182–1183; Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323, 1329 (4th Cir.), cert. denied, 409 U.S. 1000, 93 S. Ct. 312, 34 L.Ed.2d 261 (1972); City of New York v. United States, 337 F.Supp. 150, 160 (E.D.N.Y.1972). Moreover, here the District Court found no unreasonable delay, and its conclusion is warranted by the record.

## IV. STANDING

Defendants assert that MPIRG lacks standing, in that it has alleged no "injury in fact" sufficient to meet the constitutional standing requirement. The environmental interests asserted by MPIRG are well within the zone of interests protected by NEPA. United States v. SCRAP, 412 U.S. 669, 686 n. 13, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

■ We think that MPIRG has shown facts establishing that it has more than a mere interest in the outcome of the litigation.

> "Injury in fact" * * * serves to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem.

United States v. SCRAP, *supra* at 689 n. 14.

MPIRG has shown that some of its members use the BWCA for wilderness recreational opportunities it affords. It has demonstrated an effect upon the wilderness qualities of the BWCA from the logging operations. This suffices to show that its members have suffered or will suffer the requisite injury in fact to support standing. MPIRG may represent its injured members in a proceeding for judicial review. Sierra Club v. Morton, 405 U.S. 727, 739, 92 S.Ct. 1361, 31 L.Ed.2d 620 (1972). We therefore agree with the District Court that MPIRG has standing to litigate the questions presented.

## V. THE WILDERNESS ACT

 The defendants have attempted to demonstrate in their briefs that the Wilderness Act specifically provides for timber cutting within the BWCA. This claim is premature, and we decline to address ourselves to its merits in this proceeding. The District Court held the claims as they relate to the Wilderness Act in abeyance until the Forest Service completes action on its new BWCA Management Plan and accompanying impact statement.[30] This issue remains for the District Court's consideration and determination in its further proceedings in the case.[31]

The judgment of the District Court granting the temporary injunction pending the completion and filing of the EIS required by § 102(2)(C) of NEPA is affirmed.[32] The judgment of the District Court refusing to vacate the injunction in No. 73–1753 is affirmed.

ROSS, Circuit Judge, with whom STEPHENSON and WEBSTER, Circuit Judges, join, dissenting.

In this case the Forest Service made a decision that the routine supervision or extension of the time for completion of the logging contracts in question was not "major" federal action having a "significant" effect on the quality of the human environment. We think that common sense dictates that this decision was correct and that the decision of the trial court should be reversed.

These logging contracts had been entered into by the Forest Service prior to the enactment of NEPA pursuant to the authorization of Congress in the Wilderness Act. No federal expenditures were involved in either the original contracts or in the extensions thereof. Some of the contracts had been partially completed when extensions of time were granted routinely just as they had been granted in the past. Some of the contracts, such as the Sunnydale and Beartrap Sales, had not expired, no extensions had been granted, and the only "major" federal action involved continued supervision of the contracts or a *reduction* in the area to be logged. The total area in question was less than one percent of the BWCA and the location of the areas to be logged was not adjacent to any portion of the BWCA used for recreational purposes.[1] Indeed, no member of the Minnesota Public Interest Research Group had ever been in or seen any of these areas of the BWCA.

The statute in question, 42 U.S.C. § 4332(2)(C), requires all agencies of the federal government to "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on —(i) the environmental impact of the proposed action . . . ." The first obvious test to be made is suggested by the words of the statute. Does the contemplated action rise to the comparable status of "proposals for legislation," with which Congress has equated "other major Federal actions"? In our opinion, the routine extension of several tim-

---

30. 358 F.Supp. at 589.

31. We note that the dissent assumes that the Wilderness Act authorizes timber cutting within the BWCA. This is the crucial question for determination in the further proceedings in this case and, as this question is not presented in this proceeding, we express no opinion as to whether the Wilderness Act allows or prohibits timber cutting.

32. We are of the view that the injunction will terminate upon the filing of the final EIS. Any challenge to the adequacy of the final EIS will require institution of a separate proceeding.

1. See 36 C.F.R. § 293.16 (1973) which provides as follows:
 Timber harvesting is permitted in the Portal Zone under conditions designed to protect and maintain primitive recreational values. Timber within 400 feet of the shorelines of lakes and streams suitable for boat or canoe travel . . . will be specifically excluded from harvesting, and timber harvesting operations will be designed to avoid unnecessary crossings of portages.

ber sales and the continued supervision of others cannot logically be considered to be on the same level with "proposals for legislation."

We recognize there is a division of authority as to what constitutes major federal action and what is significant in terms of effect on the human environment. A review of the cases cited below [2] and of the cases cited in the majority opinion, indicates that it is primarily a matter of judgment as to what is major federal action, and what constitutes a significant effect on the human environment.

The actual crux of this lawsuit is not the advisability of logging the balance of these *particular* contracts, but rather is an effort by the plaintiffs to stop *all* logging in the BWCA. Their theory is that the forest should be permitted to thin itself periodically by natural means, (i. e. forest fires) rather than by commercial logging. It would appear from the opinion of the trial judge that he shares that view with the plaintiffs. In our judgment, this is a decision best left to the expertise of the Forest Service subject only to the right of Congress to change its policy as heretofore expressed in the Wilderness Act.

Neither do we agree that the trial court should have continued the injunction after the filing of the preliminary draft of the impact statement. At that point it became obvious that the Forest Service was not going to discontinue all logging in the BWCA, a decision it was certainly entitled to make under the provisions of the Wilderness Act; and the trial court should have at least accepted that determination at that time and dissolved the injunction. However, inasmuch as the majority has held that the injunction must be dissolved when the final impact statement is filed, which we understand will be in June of 1974, and inasmuch as the majority has made it clear that any test of that final impact statement must be in a separate lawsuit, no useful purpose would be served by further discussion of that part of the majority opinion.

We agree with the observations of Chief Justice Burger, sitting as a Circuit Justice, in Aberdeen & Rockfish R. Co. v. SCRAP, 409 U.S. 1207, 1217–1218, 93 S.Ct. 1, 7, 34 L.Ed.2d 21 (Burger, Circuit Justice, 1972):

> Our society and its governmental instrumentalities, having been less than alert to the needs of our environment for generations, have now taken protective steps. These developments, however praiseworthy, should not lead courts to exercise equitable powers loosely or casually whenever a claim of "environmental damage" is asserted. The world must go on and new environmental legislation must be carefully meshed with more traditional patterns of federal regulation. The decisional process for judges is one of balancing and it is often a most difficult task.

We would reverse with directions to dissolve the injunction.

2. Kisner v. Butz, 350 F.Supp. 310, 323 (N. D.W.Va.1972), [Construction of 4.3 miles of Forest Service road in national forest held not to call for environmental impact statement (EIS).] ; Maryland-National Capital Park & Planning Comm'n v. U.S. Postal Serv., 349 F.Supp. 1212, 1214 (D.D.C. 1972), [No EIS necessary for construction of bulk mail center in industrial park.] ; Julis v. City of Cedar Rapids, 349 F.Supp. 88, 89–90 (N.D.Iowa 1972), [Widening street from two to four lanes for fourteen blocks in city did not require EIS.] ; Morris v. Tennessee Valley Auth., 345 F.Supp. 321, 324 (N.D.Ala.1972), [Routine raising and lowering of water level at TVA dam not covered by NEPA.] ; Virginians for Dulles v. Volpe, 344 F.Supp. 573, 577–578 (E.D. Va.1972), [Allowing stretch-jets to operate at national airport not major federal action significantly affecting the human environment.] ; Citizens for Reid State Park v. Laird, 336 F.Supp. 783, 788 (D.Maine 1972), [No EIS required for use of state park for marine assault exercises.].