## MONT VERNON PRESERVATION SOCIETY

v.

John A. CLEMENTS, as New Hampshire Highway Commissioner, et al.

Civ. A. No. 76–89.

United States District Court, D. New Hampshire.

May 17, 1976.

Robert A. Backus, Devine, Millimet, Stahl & Branch, Manchester, N. H., for plaintiff.

John C. Boeckeler, Asst. Atty. Gen., State of New Hampshire, Robert A. Schwartz, Asst. U. S. Atty., for the District of New Hampshire, Concord, N. H., for defendants.

## OPINION

BOWNES, District Judge.

Plaintiff, a nonprofit environmental corporation, seeks declaratory and injunctive relief alleging that the proposed project to reconstruct a .85 mile section of Route 13 in Mont Vernon, New Hampshire, is being undertaken by the defendants in violation of federal and state law.[1] Defendants are various federal and state highway officials. In its complaint, plaintiff alleges that defendants have violated the following Federal statutes: National Environmental Policy Act, as amended, 42 U.S.C. §§ 4321 *et seq.* [hereinafter cited as NEPA]; Federal-Aid Highway Act, as amended, 23 U.S.C. § 109; and Department of Transportation Act, as amended, 49 U.S.C. §§ 1651 and 1653(f). This court has jurisdiction pursuant to 28 U.S.C. § 1331.

A hearing on the motion for preliminary relief was held on April 29, 1976, at which time plaintiff's counsel advised the court that he was seeking preliminary relief on NEPA grounds alone and that he reserved the other statutory claims until the hearing on the merits. At that time, the parties agreed that the sole issue before the court, with regard to the preliminary relief sought, was whether the Mont Vernon project was a "major Federal actions significantly affecting the quality of the human

---

1. The alleged violation of state law is contained in paragraph 18 of plaintiff's Complaint where it is alleged that defendants are advertising the project for bids before there has been a purchase of land or a declaration of taking for the proposed project and that such activity is contrary to state law.

environment . . . ." 42 U.S.C. § 4332(C). On the second and final day of the hearing, after he had rested, plaintiff's counsel sought to amend the complaint and alleged that the evidence adduced during the first day of the hearing established a clear violation of 23 U.S.C. § 128. In amending the complaint, plaintiff's counsel sought to broaden the legal theory on which he was proceeding and asked this court to consider the amendment as being part of the claim for preliminary relief.

▪ Plaintiff's eleventh hour decision to amend its complaint and expand the legal theory on which it was seeking preliminary relief surprised both the court and defense counsel. Although the issue before the court was clearly delineated at the hearing's outset, plaintiff's counsel has attempted to introduce a new cause of action without affording the defendants any notice or opportunity to contest the new allegation. In essence, plaintiff's counsel used the hearing as a discovery procedure and, as a result of the information obtained, alleges a new and additional ground for the relief sought. This is unfair both to the defendants and the court. While leave to amend should be "freely given when justice so requires," Fed.R.Civ.P. 15(a), justice, in this case, mandates that the amendment not be allowed on the motion for preliminary relief. Although I shall not consider the amendment as part of plaintiff's claim for preliminary relief, I will consider the amendment when and if I decide the case on its merits. Subject to this ruling, plaintiff's motion to amend the complaint is granted.

▪ Plaintiff did not have a monopoly on trial surprises. Defendants, just before they closed their evidence, attempted to introduce three lengthy affidavits in opposition to the motion for preliminary relief. Plaintiff objected to the affidavits contending that the averring parties were under defendants' control and that their testimony should be subjected to the rigors of cross-examination or, at the very least,

plaintiff should have been allowed the opportunity to examine the affidavits prior to their admission into evidence. While both Wright and Moore support defendants' position that affidavits are appropriate on a preliminary injunction motion,[2] their approval does not allow a party to introduce lengthy affidavits at the very last minute without the opposing party having a chance to examine them. *Cf. Marshall Durbin Farms, Inc. v. National Farmers Organization, Inc.,* 446 F.2d 353 (5th Cir. 1971). Fed. R.Civ.P. 6(d) requires that all opposing affidavits should be served "not later than 1 day before the hearing, unless the court permits them to be served at some other time." Defendants should have afforded plaintiff the opportunity to examine the affidavits prior to their last-minute introduction. Their failure to do so denied plaintiff the opportunity to adequately respond to the information and conclusions contained therein. These affidavits, Defendants' Exhibits 21, 22, and 23, are, therefore, excluded from evidence. In addition, Plaintiff's Exhibits 19 and 20 are excluded. The identification is stricken from Plaintiff's Exhibit 26 and it is admitted.

At the close of the evidence on April 30, the court took a view of Route 13 and the proposed project area in Mont Vernon.

## THE FACTS

The parties agree as to the basic facts, but they disagree as to the conclusions to be drawn from them.

The proposed highway project is on New Hampshire Route 13 which traverses the center of Mont Vernon, a small and classical New England Village. The project begins about one-quarter of a mile south of the Town Hall and runs in a northerly direction along the presently existing right-of-way for approximately .85 of a mile.

The present roadway is in poor to fair condition, having an average width of approximately twenty-four feet. There are

2. 11 Wright and Miller: Federal Practice and Procedure: Civil § 2949; 7 Moore's Federal Practice ¶ 65.04[3].

sidewalk sections intermittently alongside the road, but they are in poor condition, consisting mostly of cracked or broken asphalt. The road received a safety sufficiency rating of 61 in 1972 (Testimony of Aliotti), and, according to Reuell Webb, Deputy Commissioner and Chief Engineer for the New Hampshire Department of Public Works and Highways [hereinafter referred to as NHDPW&H], its sufficiency rating as of July, 1975, was around 50. Pl's. Ex. 3 at 2. A sufficiency rating below 65 indicates that the road represents a danger to the traveling public and is in need of repair or reconstruction. Plaintiff does not contest the need to make structural safety changes along Route 13, but alleges that the scope of the project greatly exceeds what is actually required.

Defendants, aware of Mont Vernon's "quiet and classical New England atmosphere," Pl's. Ex. 1 at 11, have attempted to minimize, even at the expense of design standards, the project's environmental impact on the Village. The negative declaration states that "[t]he project design is based on keeping the roadway within the existing right-of-way as much as feasible in order to avoid taking land and trees." Pl's. Ex. 1 at 6. Nevertheless, the reconstruction project will introduce the installation of a closed drainage system, sidewalks on both sides of the roadway, curbing, shoulders, and expansion of the roadway into "two 12-foot lanes and two 4-foot shoulders." Pl's. Ex. 1 at 6. The sidewalks will be concrete and have a width of 5 feet. As planned, the roadway from sidewalk to sidewalk will have an approximate width of 42 feet, an increase of approximately 18 feet.[3]

Defendants claim that reconstruction is necessary in order to improve the road's safety features and to alleviate a salt contamination problem which has infected drinking wells along Route 13. There are four stated reasons for reconstruction: (1) improving sight distances at Harwood Road; (2) relocating and transforming the Francestown Turnpike intersection from a "Y" shape intersection into a "T" shape intersection; (3) alleviating a blind spot in the middle of the project caused by the combined effects of a dip in the road followed by a "sharp horizontal curvature"; and (4) alleviating the salt contamination of private water supplies along Route 13. Defts.' Ex. 5.

While there is no doubt the roadway is in need of repair, I find, as a matter of fact, that the principal reason for the scope and design of the project is an attempt to retard or eliminate the salt contamination problem. An examination of the wells along Route 13, Main Street, Mont Vernon, disclosed excessive salt concentration. The NHDPW&H believed that the contamination was caused by the entry of highway salt into the ground water. Pl's. Ex. 1 at 1 and 2. The project is designed to abate this problem. Relying solely on a common sense approach and without conferring with or contacting other interested agencies, the NHDPW&H determined that an "urban type" closed drainage system was the "normal solution" to the problem. Pl's. Ex. 1 at 3–6 and Ex. 2. As planned, the new drainage system will divert and carry the road salt along with excess drainage water into Stearns Pond and Hartshorn Brook where the salt will, hopefully, be dissolved without any adverse environmental impact.

New Hampshire Route 13 is on the Federal-aid rural secondary system and 70% of the estimated construction cost of $500,000 will be paid with Federal funds.

A design alignment for the project was selected in the early part of 1973. Upon its selection, an environmental assessment of the project and alignment was made by the NHDPW&H's Interdisciplinary Evaluation Team [hereinafter referred to as IET].[4]

---

**3.** Sidewalks will not be constructed along the entire project and the in-court testimony of Aliotti and the information obtained at the view disclosed that approximately three-quarters of the .85 mile stretch will have sidewalks on both sides.

**4.** The IET is responsible for reviewing agency action and insuring that the environmental, so-

The IET, in consultation with the Federal Highway Administration [hereinafter referred to as FHWA] determines whether NEPA is applicable to a proposed project. Pl's. Ex. 4 at VII–8.

On or about May 7, 1975, the IET reviewed the Mont Vernon reconstruction project and determined its completion would not have a significant effect on the environment. Accordingly, they classified the project as a "minor action" which did not require the preparation of an environmental impact statement [hereinafter referred to as EIS]. Pl's. Ex. 6. Because it was determined that an EIS was not required, the IET, in accord with the directives of the State Action Plan, ordered the preparation of a negative declaration. Pl's. Ex. 4 at VII–2 and 7. The negative declaration is

> [a] document in support of a determination that, should a proposed improvement be constructed, the anticipated effects upon the human and natural environment will not be significant. Pl's. Ex. 4 at IV–3.

The State guidelines provide that, after a negative declaration is prepared, a public hearing must. be held at which time the affected public is given an opportunity to voice their concerns and submit to the NHDPW&H new environmental data which was, perhaps, initially overlooked or bypassed. The comments and information received at the hearing are then evaluated and reviewed by the IET before the final decision to proceed without the preparation of an EIS is made. Pl's. Ex. 4 at VII–3.

On July 10, 1975, the Highway Design Public Hearing was held in Mont Vernon's Town Hall. Pl's. Ex. 3. On August 22, 1975, the IET reviewed the proposed plan for construction and, despite the controversy engendered by the project, reaffirmed their initial determination that the project was not a "major Federal actions signifi-

cial, and economic effects of a proposed action are identified and taken account of before irreversible construction decisions are made. The IET is comprised of experts in various

cantly affecting the quality of the human environment."

The project has been approved for Federal funding and the only roadblock to its construction is this law suit.

Plaintiff argues that the defendants have not given the project a "hard environmental look" and that they are precipitantly attempting to resolve a problem, whose cause has not been clearly ascertained, by means of a reconstruction project which will cause more environmental harm than good. My task is not to ascertain whether the drainage system will solve the contamination problem; the reasons for the project are of no judicial concern to the court. My function is to determine whether NEPA is applicable to this project requiring the preparation of an EIS.

Plaintiff contends that the project is a "major Federal action significantly affecting the quality of the human environment." Defendants disagree and argue that the project is a minor Federal undertaking having only a minimal effect upon the quality of the human environment. Both parties agree that, if I find the Mont Vernon project to be a "major Federal actions significantly affecting the quality of the human environment," an EIS must be prepared.

The issue is whether it was reasonable for the defendants to conclude that the reconstruction of Route 13 in Mont Vernon would not have a significant effect upon the quality of the human environment. Considering this is a motion for preliminary relief, I find that it was reasonable for defendants to so conclude and plaintiff's motion for a preliminary injunction is denied.

## THE LAW

The preparation of an EIS is, perhaps, the most essential and vital stage of the NEPA process. It is here that NEPA's "hard environmental look" is to take place

fields such as a design engineer, a planning engineer, a biologist, an air and noise pollution analyst, a water pollution analyst, and an appraiser. *See* Pl's. Ex. 4 at VIII–1–3.

and precipitous action retarded. *Calvert Cliffs' Coord. Com. v. United States A. E. Comn.,* 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971). The determination that an EIS is not required must be closely scrutinized for, in failing to prepare an EIS, the intensive environmental examination directed by Congress in its passage of NEPA is avoided.

■ There is a split in the circuits as to the standard of review to be applied to an agency's initial decision not to prepare an EIS. Some circuits have held that the threshold determination not to prepare an EIS should be reviewed against the standard of whether the decision was arbitrary and capricious. *Hanly v. Kleindienst,* 471 F.2d 823 (2d Cir. 1972), (*Hanly* II); *First National Bank of Chicago v. Richardson,* 484 F.2d 1369 (7th Cir. 1973). Other circuits have held that the decision not to prepare an EIS must be measured by a standard of reasonableness. *Minnesota Public Interest Research Group v. Butz,* 498 F.2d 1314 (8th Cir. 1974); *Wyoming Outdoor Coordinating Council v. Butz,* 484 F.2d 1244 (10th Cir. 1973); *Save Our Ten Acres v. Kreger,* 472 F.2d 463 (5th Cir. 1973). I have previously held that "[w]hen reviewing an agency's threshold determination not to file an EIS, the court" should review that decision against a standard of reasonableness. *Essex County Preservation Association v. Campbell,* 399 F.Supp. 208, 216 (D.Mass.1975) (Bownes, J., sitting by designation). I shall continue to apply this standard until the First Circuit or the Supreme Court rules to the contrary.

■ The action-enforcing provision of NEPA is 42 U.S.C. § 4332(C) which requires all Federal agencies to

include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

The initial question is whether the statutory phrase, "major Federal actions significantly affecting the quality of the human environment" creates two distinct requirements which plaintiff must satisfy before an EIS will be judicially required; the first test being that the action undertaken must be major in "scope," and, second, if the action is determined to be major, its impact on the environment must be significant. Under this analysis, only if an action is both major and its impact significant, will an EIS be required. *Hanly v. Mitchell,* 460 F.2d 640, 644 (2d Cir.), *cert. denied,* 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972) (*Hanly* I); *Scherr v. Volpe,* 466 F.2d 1027, 1032–33 (7th Cir. 1972). Pursuant to this methodology, the court first inquires into the objective facts surrounding the project's construction such as its cost, the amount of planning preceding it, and the time needed to complete the project in order to determine whether the project is a major or minor action. *Hanly* I, *supra,* 460 F.2d at 644; *see also Simmans v. Grant,* 370 F.Supp. 5, 13–15 (S.D.Tex.1974). Accordingly, it has been held, in a case very similar to the one involved here, that once it has been determined the project is not a major federal action, then that is the end of the court's inquiry and the significance of the project's environmental impact, whether it be monumental or miniscule, is not to be considered and an EIS will not be required. *See Julis v. City of Cedar Rapids, Iowa,* 349 F.Supp. 88 (N.D.Iowa 1972).

■ Courts have recently begun to look at a project not in terms of its size or the amount of its expenditures, but solely in terms of the possible effects the project

could have on the environment. *City of Davis v. Coleman,* 521 F.2d 661, 673 n.15 (9th Cir. 1975); *M. P. I. R. G. v. Butz, supra,* 498 F.2d at 1321–22; *McDowell v. Schlesinger,* 404 F.Supp. 221, 6 ELR 20224, 20237–40 (W.D.Mo.1975). The test as enunciated in these cases is simply whether the proposed project could have a significant effect on the quality of the human environment. If so, then NEPA is applicable and an EIS must be prepared.

To separate the consideration of the magnitude of federal action from its impact on the environment does little to foster the purposes of the Act, *i. e.,* to "attain the widest range of beneficial uses of the environment without degradation, risk to health and safety, or other undesirable and unintended consequences." By bifurcating the statutory language, it would be possible to speak of a "minor federal action significantly affecting the quality of the human environment," and to hold NEPA inapplicable to such an action. Yet if the action has a significant effect, it is the intent of NEPA that it should be the subject of the detailed consideration mandated by NEPA; the activities of federal agencies cannot be isolated from their impact upon the environment. This approach is more consonant with the purpose of NEPA and is supported in S.Rep.No.91–296, *supra,* and the CEQ Guidelines. *M. P. I. R. G. v. Butz, supra,* 498 F.2d at 1321–22.

I adopt this approach and rule that plaintiff need not establish that the Mont Vernon project is a "major" Federal undertaking in order for NEPA to be applicable. Instead, an EIS will be ordered if plaintiff can establish that defendants' decision that the project will not have a significant effect on the quality of the human environment was

not reasonable considering all the circumstances. "This will require a showing that the project could significantly affect the quality of the human environment." *M. P. I. R. G., supra,* 498 F.2d at 1320, citing *Save Our Ten Acres v. Kreger,* 472 F.2d 463, 466 (5th Cir. 1973).[5]

■ In determining the significance of a proposed project's environmental impact, the reviewing agency must consider:

. . . (1) the extent to which the action will cause adverse environmental effects in excess of those created by existing uses in the area affected by it, and (2) the absolute quantitative adverse environmental effects of the action itself, including the cumulative harm that results from its contribution to existing adverse conditions or uses in the affected area. *Hanly* II, *supra,* 471 F.2d at 830–31.

Although "[m]an's ability to alter his environment has developed far more rapidly than his ability to foresee with certainty the effects of his alterations," *Ethyl Corporation v. EPA,* 541 F.2d 1, 6, 6 E.L.R. 20267, 20269 (D.C.Cir. 1976), the reviewing agency must, at the initial stage, attempt to determine the potential environmental impacts which can be expected to flow from the proposed action. *McDowell v. Schlesinger, supra,* 404 F.Supp. 221, 6 E. L.R. at 20238.

In analyzing a project's impact, the setting in which the construction is to take place must be kept in mind. A reconstruction project in a rural setting, like Mont Vernon, could have a much greater environmental impact than an identical project in an urban area. *See* The Council on Environmental Quality guidelines which state:

. . . The significance of a proposed action may also vary with the setting,

---

**5.** Plaintiff argued that when the defendants evaluated the project to determine whether it was a minor or major project, they applied outdated standards, Pl's. Ex. 4 at g–2 and Ex. 9, and that the project must be reassessed under the standards contained in 23 C.F.R. § 771.9 (1975). This inquiry is not particularly relevant in view of my analysis for, as stated in the text, I do not adopt a bifurcated approach to NEPA and, even if I did, I do not believe that

plaintiff's position has very much merit. I, therefore, do not address myself to the issue whether defendants' preparation of a negative declaration was implicit recognition that the project was a major Federal action. *Compare* 23 C.F.R. § 771.11 (1975) *with* Pl's. Ex. 4.

If I adopted the bifurcated approach, then I would have found that the action undertaken was not a "major Federal action."

with the result that an action that would have little impact in an urban area may be significant in a rural setting or vice versa. 40 C.F.R. § 1500.6(b) (1975). And while neighborhood protest does not transform an insignificant environmental impact into a significant one, *Citizens for Reid State Park v. Laird,* 336 F.Supp. 783 (D.Me.1972), the court should consider the effect the project will have on those persons who live in or near the construction area. *Hanly* I, *supra,* 460 F.2d at 646–47.

Because defendants believed an EIS not to be required for the Mont Vernon project, they prepared a negative declaration. The negative declaration affords the NHDPW&H the opportunity to express publicly the reasons and factors which led it to conclude the project would not have a significant environmental impact. The public is then given the opportunity to rebut the facts contained in the negative declaration or offer new or contradictory evidence.

■ The Mont Vernon negative declaration considered and evaluated the viability of various alternatives, *e. g.:* (1) replacement of contaminated wells; (2) discontinuing the use of deicing salt; (3) reducing salt usage; (4) use of salt substitutes; and (5) installation of a public water supply. For a variety of reasons, extending from energy and economic conservation to safety considerations, the IET found the alternatives to be less prudent and feasible than the original design plan.

The negative declaration briefly considered the social, economic, and environmental effects of the proposed project. The report concluded that the widening of Route 13 would not alter present traffic patterns and, therefore, would not affect regional or community growth. Because reconstruction will essentially follow the existing road alignment, the report concluded that only a minimal amount of land acquisition was necessary and no families, homes, or businesses would be displaced by the action. It must also be noted that the largest land acquisition will occur at the Francestown Turnpike intersection and

plaintiff has repeatedly made clear that it does not object to the relocation of the Turnpike's intersection. Its chief concern is the extension of the roadway through the Village's center.

The negative declaration recognizes that a secondary effect of the project will be the elimination of almost all on-street parking, but concluded that this loss was not viewed as "a significant adverse impact." Pl's. Ex. 1 at 10.

The effects caused by the diversion of road salt into neighboring streams and ponds were also considered. It was determined that diversion will cause a slight increase in the chloride content of these waters, but that this increase would not be significant because much of the salt will enter the brooks during "spring runoff" when the water flow is abnormally high tending "to dilute the salts so that severe fluctuations in chloride concentrations [will not be] experienced." *Id.* at 11. The New Hampshire Fish and Game Department was consulted on this matter and they "indicated that there would probably not be any adverse effects" caused by the project. *Id.* at 11. In addition, Donald Burford, Environmental Engineer for the NHDPW&H, stated at the highway design public hearing that the coordinated studies of the Fish and Game Department and Water Supply and Pollution Control Commission affirmed the determination "that the project will not have a significant adverse impact on the surface water quality of the area or on their aquatic ecosystem." Pl's. Ex. 3 at 9.

It was also determined that the project would not substantially affect the locality's air quality or cause a substantial increase in noise levels.

It is true that a negative declaration, unlike an EIS, does not provide a detailed environmental assessment of the project. The negative declaration is an agency record which enables the reviewing court to determine whether various environmental factors were identified and considered by the agency before it made its determination not to prepare an EIS. *Hanly* I, *supra,* 460

F.2d at 647; *Simmans, supra,* 370 F.Supp. at 17. I find that the negative declaration is procedurally satisfactory.

Plaintiff did not introduce at the hearing any weighty evidence in support of its position that the project could have a significant adverse impact on the environment. The evidence was: (1) widening the roadway will cause an increase in vehicular traffic speed; (2) on-street parking will be eliminated; (3) some trees and shrubbery will be removed; and (4) the widening of the roadway will harm the cultural and aesthetic environment of the Village and destroy its ambience as "a quiet and classical New England Village."

The evidence indicated that, while the widening of a highway will, as a general proposition, increase traffic speeds, highway curbs will be constructed which will tend to "control" this increase and negate the "increase speed" effect caused by the widening of the highway. There is no evidence that any of the merchants along Route 13 will be economically harmed if on-street parking is eliminated. At most, the elimination of this parking is an inconvenience and little more. While the removal of trees and shrubbery is indigenous to almost any highway project, the exact number of trees that must be removed was never ascertained. There will not, however, be a wholesale cutting of trees in order to complete the project and, at most, the number of trees to be eliminated will not be more than ten. Finally, reconstruction will not cause a change in land use or development patterns, and I cannot rule as a matter of fact or law that the widening of the roadway will have a significant adverse effect on Mont Vernon's rural and classical New England atmosphere. Viewed separately and cumulatively, these effects do not create a significant environmental impact.

Solicitude for the environment is not a substitute for legal evidence and I find that it was reasonable for defendants to conclude that the reconstruction project on Route 13 would not significantly affect the quality of human environment. *See Nodell*

*Investment Corporation v. Coleman,* 396 F.Supp. 1341 (E.D.Wis.1975); *Hendrickson v. Wilson,* 374 F.Supp. 865, 875 (W.D.Mich. 1973); *Kisner v. Butz,* 350 F.Supp. 310 (N.D.W.Va.1972); *Julis v. City of Cedar Rapids, supra.*

Plaintiff's motion for preliminary relief is denied.

SO ORDERED.