**August R. RYSAVY, Plaintiff,**

**South Dakota Housing Development Authority, Intervenor,**

**Sioux Falls Housing and Development Commission, Intervenor,**

v.

**Patricia Roberts HARRIS, Secretary of Department of HUD, Jay Soloman, Administrator of General Services Administration, Department of Housing and Urban Development and General Services Administration, Defendants.**

**No. CIV 78–4061.**

United States District Court,
D. South Dakota, S. D.

Sept. 20, 1978.

George O. Johnson, of May, Johnson, Doyle, Becker & Fisher, Sioux Falls, S.D., for plaintiff.

William H. Engberg, Pierre, S.D., for intervenor South Dakota Housing Development Authority.

Stuart L. Tiede, of Woods, Fuller, Shultz & Smith, Sioux Falls, S.D., for intervenor Sioux Falls Housing and Development Commission.

Robert D. Hiaring, U.S. Dist. Atty., Sioux Falls, S.D., and Eric S. Gould, Dept. of Justice, Washington, D.C., for defendants.

## COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

NICHOL, Chief Judge.

The following shall constitute the Findings of Fact and Conclusions of Law of the Court:

### FINDINGS OF FACT

1. The plaintiff, August R. Rysavy, President of Local 228, National Federation of Federal Employees, which represents all non-supervisory employees of the Sioux Falls Insuring Office, Department of HUD, has filed this suit alleging that a restructuring of the Department will result in the transfer, termination or downgrading of certain of the Department employees who perform production, management and multi-family housing insuring functions in the Sioux Falls, South Dakota Insuring Office. Specifically, the restructuring provides for the transfer of part of the Sioux Falls operations to the Denver, Colorado Regional Office.

2. The plaintiff is seeking a preliminary injunction to prevent the Department of HUD from implementing its reorganization concerning the Sioux Falls Insuring Office operations.

3. The plaintiff alleges that his cause of action is based on the following Executive Orders, statutes, and Constitutional Amendment: National Environmental Policy Act of 1969, 42 U.S.C. Section 4321 et seq.; The Environmental Quality Improvement Act of 1970, 42 U.S.C. Section 4371 et seq.; Rural Development Act of 1972, Title VI, 42 U.S.C. Section 3122; The Intergovernmental Cooperation Act of 1968, Title IV, 42 U.S.C. Section 4231 et seq.; Executive Order No. 11752; Executive Order 11512 and the Due Process Clause of the United States Constitution.

4. An evidentiary hearing was held on July 6, 1978, on the plaintiff's application for a preliminary injunction. At that hearing motions were made on behalf of the Sioux Falls Housing and Redevelopment Commission and the South Dakota Housing Development Authority to intervene. The court granted the motions of the two intervenors but reserved its ruling on whether the preliminary injunction should be issued.

5. Shortly after he took office, President Carter directed the Secretary of HUD to determine how best to achieve improvements in the management, efficiency and delivery of Federal Services in her Department. As a result of that directive, the Secretary appointed the Under Secretary in mid-February, 1977, to form an Organization Assessment Group to identify and analyze deficiencies in the achievement of HUD's mission, and develop organizational corrections.

6. The Organization Assessment Group identified deficiencies in the achievement of HUD's mission so that recommendations could be developed to correct them. Among the deficiencies identified were excessive overhead costs in some Field Offices caused by changes in workload, inefficient program management and unclear lines of control over Field operations.

7. On October 13, 1977, the Secretary of HUD announced certain organizational changes that were to be made in the structure of the Department. The new HUD structure evolved from an analysis of various vertical structure models and of the current organization.

8. The new HUD structure includes the better features of the best structures considered by the Organization Assessment Group, and it has the advantage of building them into the present organization with a minimum of cost, delay, and staff and program disruption.

9. During the planning stage of HUD's reorganization, the Department solicited the views of its employees.

10. HUD also contacted, in the planning stages of its reorganization, various public interest groups including several national organizations representing State and Local interests for their views. Among those contacted, but not limited to, were the Council of State Governments, International City Management Association, National Governor's Conference, the National League of Cities and the United States Conference of Mayors.

11. HUD received responses from the National Association of Regional Councils, the National Governor's Conference, and the Council of State Governments.

12. HUD considered these comments and took them into account in planning the reorganization.

13. The development of the new organizational format for HUD was based in part upon the analysis of the cost of maintaining each office in relation to the workload in each office. This analysis revealed that the cost of maintaining some offices was very high in relation to other offices.

14. Based upon such analysis, the desirability of reducing overhead costs, consolidating scarce technical skills, improving program management, and meeting other objectives identified by the Organizational Assessment Group, HUD decided to consolidate its delivery system.

15. One part of the consolidation process was HUD's transfer of some HUD employees and the production, management, and multi-family housing insuring functions from the Sioux Falls, South Dakota Insuring Office and Full Service Housing Office to the Denver, Colorado Regional Office.

16. Before HUD undertook to implement its proposed reorganization, it made an analysis and examination of the question, Whether the National Environmental Policy Act of 1969, 42 U.S.C. Section 4321 et seq. (NEPA), required the preparation of an environmental impact statement concerning the planned reorganization.

17. An environmental assessment review was performed with the Office of Organization and Management Information given lead responsibility for its preparation.

18. The analysis done by OMI looked at the following factors ascertaining the extent of impact caused by the reorganization.

(a) Impact on employees.

(b) Impact on localities including effects on employment levels, tax bases, school systems, utilities, housing markets and traffic congestion.

(c) Alternatives to the proposed HUD structure were reviewed for their environmental impacts and for their ability to meet HUD's statutory requisites and the goal sought in reorganization.

19. Both the macro and micro analysis of the impacts of the reorganization led to the conclusion that the reorganization was not a major federal action significantly affecting the quality of the human environment.

20. On November 4, 1977, HUD issued its Findings of Inapplicability of Environmental Impact Statement Requirement and Environmental Assessment.

21. In concluding that the proposed reorganization did not constitute a major federal action significantly affecting the quality of the human environment, HUD relied upon numerous findings, including the following:

(a) The proposed reorganization would involve the transfer of a maximum of 1300 HUD employees nationwide;

(b) In reality, the number of HUD employees who would consent to relocation was approximately 780 nationwide;

(c) The magnitude of the movement of staff from location to location, in relation to the size of the affected communities, was "insignificant" in terms of its possible impact on housing markets, public services, tax bases and traffic congestion;

(d) Employees whose functions would be transferred would be faced with moving. into a new location, a potentially higher cost of living, changing working relationships etc.;

(e) The Department was making every effort to keep the necessary transfers to a minimum, and the reorganization model proposed was the least disruptive of all models considered;

(f) The Secretary of HUD was committed to offer every employee a job somewhere else in the Department;

(g) The projected cost of the HUD reorganization was $11.5 million, but it was anticipated that savings of $556.4 million would result in the first four years following the reorganization.

22. At the present time, the Sioux Falls Insuring Office and Full Service Housing Office is responsible for both single family and multi-family loan insurance functions. After the reorganization, Sioux Falls will remain open as a Valuation and Endorsement Station. The production, management, and multi-family housing insuring functions will be transferred to Denver, Colorado, from the Sioux Falls office, except that certain functions will continue to be performed in Sioux Falls by some employees who will remain in the Sioux Falls office.

23. The implementation coordinator for the reorganization of the Department Field Office on Region VIII, Gerald J. Hannon, visited the Sioux Falls, South Dakota, office on March 15, 1978. During the visit to the Sioux Falls office, Mr. Hannon held a meeting with all employees of that office to explain the reorganization. Mr. Hannon held one meeting with supervisory person-

nel and made himself available to speak with any employee, individually, who requested a conference with him.

24. There are a total of twenty-five (25) employees in the South Dakota offices. As a result of the reorganization the number of employees in the Sioux Falls office will be reduced from twenty-one (21) to seven (7). The Rapid City office will be reduced from four (4) employees to one (1) employee.

25. The effect on individual employees as a result of the reorganization is as follows:

(a) Two (2) employees will remain in the Sioux Falls office with no reduction in grade pay levels.

(b) Five (5) employees voluntarily accepted lower grade pay levels to remain with the Department in Sioux Falls. The lower grade levels, however, will not prevent those employees, in most cases, from maintaining their current levels of pay for two years.

(c) Six (6) employees will not retain their current grade pay levels and transfer to the Denver Regional Area Office.

(d) Four (4) employees have chosen to retire in 1978. Two (2) employees chose to retire in 1977.

(e) Two (2) employees have been or will be offered positions at their current grade levels in Department offices in other areas. One (1) has yet to respond to the offer. The other offer has not been made due to issuance of the Temporary Restraining Order.

(f) Three (3) employees have chosen to resign. One (1) of these employees was part time and another employee was subsequently hired on a temporary appointment.

(g) Frank Heintzman will retain his GS-11 grade pay level and report to the Sioux Falls office but will be outstationed in Rapid City, South Dakota.

(h) Fern Pulsher will transfer to a position at Ellsworth Airforce Base.

(i) Palmyra Spencer will be removed from her GS-9 grade pay level position, having failed to accept a tender of offer for another position.

26. HUD's reorganization does not involve any changes in HUD's funding of housing. The State of South Dakota will be entitled to the same share of federal funds for public housing and low income housing, irrespective of the location of the HUD office responsible for processing and managing multi-family projects after reorganization.

27. The proposed reorganization of the HUD office will have no primary impact upon natural resources on the quality of the physical environment.

28. The proposed reorganization will have a speculative or negligible impact upon the availability of multi-family housing in Sioux Falls or South Dakota.

29. Plaintiffs have failed to show that the proposed action will lead to a significant decrease in service offered by HUD to either Sioux Falls or South Dakota.

30. Plaintiffs' concerns deal with very limited socioeconomic interests rather than the quality of the physical environment.

31. The proposed reorganization is not a federal or federally assisted development program or project.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and subject matter of this action under 28 U.S.C. Section 1331(a) and 5 U.S.C. Section 702.

2. The issue raised by the plaintiff is a nonjusticiable "political question." The internal decision of HUD to adjust its manner of servicing the public was pursuant to a political decision of the Executive Branch. Such a decision is demonstrably committed by the Constitution to the Executive Branch; judicially discoverable and manageable standards for resolving it are lacking; and a court could not possibly undertake independent resolution of the controversy without expressing a lack of the respect due the coordinate branches of government. *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1961); *City of Kansas City, Kansas v. Harris*, Civil No.

78–2015 (D.Kan. July 17, 1978); *White v. Harris*, Civil No. 78–408 (D.N.M. August 18, 1978).

3. The defendants' decision not to prepare an environmental impact statement did not violate 42 U.S.C. Section 4332(2)(C); *City of Kansas City, Kansas v. Harris, supra; White v. Harris, supra.*

4. NEPA requires the preparation of an environmental impact statement only when it appears that a proposed action is a major federal action significantly affecting the quality of the human environment. 42 U.S.C. § 4332(2)(C). *City of Kansas City, Kansas v. Harris, supra; White v. Harris, supra.*

5. Plaintiffs have failed to state a claim under the NEPA and have failed to show any environmental harm cognizable under NEPA. *City of Kansas City, Kansas v. Harris, supra; White v. Harris, supra.*

6. The proposal to transfer some HUD employees and multi-family functions from the Sioux Falls office to the Denver, Colorado, area office does not constitute "major federal action" to which the environmental impact statement is applicable nor is the entirety of the HUD reorganization scheme a "major federal action" within the meaning of 42 U.S.C. § 4332(2)(C). *City of Kansas City, Kansas v. Harris, supra; White v. Harris, supra.*

7. The term "major" in this context connotes a federal action of large and considerable importance, requiring the expenditure of substantial time, reasons and planning, *e. g., Mount Vernon Preservation Soc. v. Clements*, 415 F.Supp. 141 (D.N.H.1976); *Julis v. City of Cedar Rapids*, 349 F.Supp. 88 (D.Iowa 1972); *Natural Resources Defense Council, Inc. v. Grant*, 341 F.Supp. 356 (D.N.C.1972).

8. NEPA was never intended to be used for purposes of promoting full employment or preventing the discharge or transfer of federal personnel. *Breckinridge v. Rumsfeld*, 537 F.2d 864 (6th Cir. 1976), nor was it ever envisioned to be a substitute community planning device. *Concerned About Trident v. Rumsfeld*, 180 U.S.App. D.C. 345, 555 F.2d 817 (1977).

9. Because the primary concern of NEPA is the protection of the "physical environmental resources of the nation," an environmental impact statement is not required by the mere fact that socioeconomic consequences may be triggered by governmental action. *Image of Greater San Antonio, Texas v. Brown*, 570 F.2d 517, 522 (5th Cir. 1978).

10. Absent proof that the defendants' conduct will have a discernible—not to mention "significant"—impact upon the integrity of the nation's physical environmental resources, the Court must sustain the defendants' determination that NEPA did not require the preparation of an environmental impact statement; that determination was reasonable under the circumstances and therefore HUD complied with the standard set out by the Eighth Circuit Court of Appeals. *Minnesota Public Interest Research Group v. Butz*, 498 F.2d 1314 (8th Cir. 1971); *White v. Harris, supra.*

11. The defendants utilized a systematic, interdisciplinary approach that would insure the integrated use of the natural and social sciences and environmental design arts in their decisionmaking process; the defendants' "negative EIS findings" evidences the utilization of precisely such an approach in a thorough, systematic, and good faith manner. 42 U.S.C. Section 4332(2)(A); *White v. Harris, supra.*

12. Executive Order 11752 does not expressly create any private cause of action on behalf of these or any other plaintiffs.

13. Executive Order 11512 does not expressly create any private cause of action on behalf of these or any other plaintiffs. *Kuhl v. Hampton*, 451 F.2d 340, 342 (8th Cir. 1971); *City of Kansas City, Kansas v. Harris, supra; White v. Harris, supra.*

14. Private rights of action may be inferred when necessary to effectuate the purpose of a statute or regulation. *J. I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964).

15. The Court here sees no need to find an implied private right of action that would extend to these plaintiffs; the managerial obligations created by Executive Orders 11752 and 11512 are so broad and vague that inferring a private right of action in them would create a strong possibility of protracted lawsuits brought by persons with little at stake before any federal office—of whatever negligible size—could be relocated. *City of Kansas City, Kansas v. Harris, supra; White v. Harris, supra. See also, Acevedo v. Nassau County*, 500 F.2d 1078 (2d Cir. 1974); *Kuhl v. Hampton, supra.*

▆▆▆ 16. Plaintiffs failed to state or to prove a claim under the Intergovernmental Cooperation Act, Title IV, 42 U.S.C. Section 4231 et seq. The Intergovernmental Cooperation Act applies only to development programs and does not apply where a facility is being reorganized and functions and employees are being transferred. *Township of Dover v. United States Postal Service*, 429 F.Supp. 295, 298 (D.N.J.1977); *White v. Harris, supra.*

▆▆▆ 17. Plaintiffs lack standing to raise the Rural Development Act, 42 U.S.C. § 3121, et seq. Furthermore, the Act does not apply to the mere consolidation of existing offices. It applies to the establishment of new offices or other facilities. *White v. Harris, supra.*

▆▆▆ 18. Plaintiffs failed to state or to prove a claim for relief under the Due Process Clause of the United States Constitution. *Board of Regents of State College v. Roth*, 408 U.S. 564, 569–570, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *National Association for the Advancement of Colored People (Atlanta Local) (NAACP) v. United Postal Service*, 398 F.Supp. 562, 563–564 (N.D.Ga.1975); *White v. Harris, supra.*

19. Defendants are entitled to prevail on the merits of the case and an order dissolving the Temporary Restraining Order shall be drawn and filed by the defendants.