## CLARK PARK CITIZENS FOR ACTION, Plaintiff,

v.

## CITY OF DETROIT et al., Defendants.

### Civ. A. No. 80–74420.

United States District Court,
E. D. Michigan, S. D.

Dec. 15, 1980.

---

Wayne County Neighborhood Legal Services by Mark H. Magidson, Detroit, Mich., for plaintiff.

Sylvester Delaney, Deputy Corp. Counsel, Kay Schloff, Nancy P. Vanderbeek, Harnetha Williams, Asst. Corp. Counsels, Detroit, Mich., Richard A. Rossman, U. S. Atty., Mark R. Werder, Asst. U. S. Atty., Detroit, Mich., Frank J. Kelley, Atty. Gen., of Michigan, Francis J. Pipp, Terrence P. Grady, Asst. Attys. Gen., Lansing, Mich., for defendants.

## OPINION AND ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

PATRICIA J. BOYLE, District Judge.

Plaintiff, Clark Park Citizens for Action, brought this action to compel Defendants to

comply with the National Environment Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, in their approval of federal grant assistance for the redevelopment of Clark Park. Plaintiff also alleges violations of Michigan Statute M.C.L.A. 691.1202 and of the Fourteenth Amendment.

The Court has jurisdiction pursuant to the Administrative Procedures Act. 5 U.S.C. § 702.

Plaintiff's complaint is directed at the failure of the federal Defendants to require approval of the project on the basis of an environmental impact statement (EIS). Instead, Defendant Heritage Conservation and Recreation Services, the regional agency for the Department of Interior overseeing the qualification of grant projects under federal law, determined that an EIS was not required on the basis of the grant application, the City's recitation of the absence of community reaction after notice and public hearing, and a supporting environmental assessment of the project.

Plaintiff seeks a declaration that the approval was unlawful and a permanent injunction enjoining further construction and expenditure of federal funds for the Clark Park Redevelopment Plan until an environmental impact statement is prepared, filed, and approved.

On November 24, 1980, a Temporary Restraining Order was issued restraining further construction in Clark Park pending a hearing set for December 3, 1980, as to why a preliminary injunction should not issue. Testimony having been taken and arguments and briefs now having been received, I conclude for the reasons which follow that Plaintiff's request for preliminary relief must be denied.

### Standards Governing Judicial Review of Agency Action

Plaintiff's claim, in essence, is that the Clark Park Redevelopment Plan is a major federal action significantly affecting the quality of the human environment, that an environment impact statement was therefore required before grant approval, and that the Defendants' action was therefore not authorized by federal law.

At the outset, I conclude that the agencies' finding may be set aside only if it is arbitrary, capricious, or not otherwise in accord with the law. *Mid-Shiawassee County Concerned Citizens v. Train*, 408 F.Supp. 650 (E.D.Mich.1976), aff'd, 559 F.2d 1220 (6th Cir. 1977) (table). This approach is in accord with the standard set forth in the Administrative Procedures Act, 5 U.S.C. § 706(2)(A) and (D). Moreover, it permits judicial scrutiny of the legal issues presented by the actual decision while allowing "the agencies to have some leeway in applying the law to factual contexts in which they possess expertise." *Hanly v. Kleindienst*, 471 F.2d 823, 829–30 (2d Cir. 1972), cert. denied, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973) (Hanly II).

The absence of any Congressional guideline to the interpretation of the term "significantly" in the NEPA has been construed as an indication that "Congress apparently was willing to depend principally upon the agency's good faith determination as to what conduct would be sufficiently serious from an ecological standpoint to require use of the full-scale procedure," *Hanly v. Kleindienst*, 471 F.2d at 830. Adoption of the arbitrary, capricious, or clear error of judgment standard facilitates this apparent intent while requiring the reviewing court to engage in a "substantial inquiry" as to whether the agency has acted within its lawful authority, whether the choice made was not unreasonable as a matter of law, and whether the action followed necessary procedural requirements. *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415–16, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971). I therefore conclude that this standard for review is appropriately applied in the instant case.

### Factual and Procedural History of the Proceeding

The evidence presented established that Clark Park was deeded to the City as a permanent park site approximately ninety years ago. It is located in the southwest

section of the City, is approximately thirty acres in size, and services a community of 70,000 persons (1970 census). Presently, the park contains a large passive use area and numerous recreation facilities, including an ice rink, two baseball diamonds, play equipment, tennis courts, a recreation building, and an unused wading pond. The park is designated by the City as a "community" rather than a "neighborhood" park because of the large number of people it serves. It is undisputed that Clark Park has not had a major renovation since the late 1940s and that its recreational facilities are badly deteriorated. The park's two ball diamonds are hard packed through usage and the outfields overlap, creating a safety hazard. A 1,000-foot cinder pathway opens the park up to unlawful auto traffic. The park has many areas of broken asphalt (such as the tennis courts) and of sparsely seeded grass.[1]

As early as 1974, City planners proposed a major renovation of Clark Park. Among the renovations proposed was the installation of a thirty-four space paved parking lot adjacent to the ice rink, which was suggested as a safety measure for recreation employees leaving their jobs at night, for the convenience of delivery persons, and to prevent the unlawful use of the cinder service drive through the park by park users, particularly those such as hockey players having equipment to unload.[2] Both Plaintiff's and Defendants' witnesses testified that there was a lengthy history of unlawful driving and parking by users in the park interior, causing the service drive and grassy areas to become rutted and muddy.

In March of 1977 Defendant City submitted a preliminary application to the Michigan Department of Natural Resources as liaison for the federal Defendant Department of the Interior seeking consideration for funding of Clark Park renovation under the Land and Water Conservation Fund Act. The state agency's function is to screen pre-applications, according to federal agency guidelines, in order to determine those local projects which are likely to qualify for federal funding without the lengthy and expensive process of preparing a full environmental impact statement. With a view to eliminating, at the screening level, projects engendering significant controversy, the state also required an approved pre-application grantee to notice and convene a public meeting on the proposal (Exhibit 20) and to submit the plan to local planning agencies. The Clark Park project was submitted for approval to SEMCOG (South East Michigan Council of Governments) and the City Planning Commission, and on August 17, 1977, a public hearing was held by the City Department of Parks and Recreation. Notice of the hearing was published in the Detroit Legal News, the Michigan Chronicle, and the Detroit Free Press. Notice was also posted in the neighborhood city hall and the City-County Building. Only a few citizens attended the meeting. In addition, in July of 1977 (Exhibits 11 and 12), City officials, including the Mayor, attended a "family day festival" held in Clark Park and presented the proposed plan for viewing. No adverse comment was received at any time until August of 1980 when Plaintiff collected and presented to Parks and Recreation petitions bearing the signatures of 800 persons protesting the construction of the parking lot because it would "take away valued and necessary recreational space" (Exhibit 5).

The City's application includes an attachment entitled "Environmental Assessment—Redevelopment of Clark Park" dated August, 1977. Based upon the documentation supplied by the City and the absence of controversy, the senior project analyst for the Department of the Interior, Mr. Marion May, determined that an EIS would not be required. Mr. May testified at the hearing and specifically stated with regard

---

1. On December 15, 1980, I viewed the park and found that the testimony gave a generally complete picture of the park. The view confirmed that many large trees remain standing and that the north end of the park, which presently sees "passive use," will remain virtually unaltered.

2. The unrebutted testimony of Ms. Betty Lloyd established that of eight official ice rinks in City parks, Clark Park is presently the only park without on-site parking for ice skaters.

to the parking lot that an addition of a parking lot of this size is considered a support facility not requiring an EIS unless it effects a specifically protected federal interest such as marshlands or flat lands. Indeed, federal guidelines for a project of this type require the grantee to guarantee accessibility to the site, either in the form of on-site parking, assurance of street parking, or assurance from the holders of other off-site parking (such as schools near Clark Park) that they would assure off-site parking. On December 22, 1977, the Detroit City Council accepted a grant of Four Hundred Fifteen Thousand Dollars ($415,000) from the Federal Land and Water Conservation Fund, authorized the execution of the Project Agreement, and agreed to provide matching funds.

The proposed redevelopment includes regrading and expansion of the ball fields, basketball courts for warm weather use to be placed on the existing ice rink, removal of old tennis courts and construction of new ones, improvements to the play area, grassing over of the cinder service road, walkway lighting through the passive use area, removal of a nonfunctional cement wading pool and construction on its site of a grassy amphitheater with a small stage, and installation of a thirty-eight car parking lot adjacent to the ice rink. Twelve trees will be removed (11 had already been removed at the time of institution of the action), but it is undisputed that an additional 29,800 square feet of grassy area and 109 shade trees, 78 ornamental trees, 46 evergreens, and 70 to 80 shrubs will be added to the park.

### The Environmental Assessment of the Project

The NEPA and agency regulations in effect at the time in question required the applicant to prepare a written assessment covering eight points, among them: describing the proposed action and the environment; the environmental impacts of the action, direct or indirect, beneficial or adverse; any mitigating measures designed to mitigate environmental harm; unavoidable adverse environmental impacts; and alternatives to the proposed action. What was required was in effect a "mini" EIS.

The environmental assessment of the Defendant City developed the observation that the redevelopment plan presented no known effect on water or mineral resources, on species of flora or fauna, no known or suspected historical or archeological values, or no change in use of the surrounding areas. It acknowledged reduction of grassy area and trees lost to new construction, noting that these changes would be offset by returning other areas to grass and planting new trees (Plaintiff's Exhibit 3). In terms of social impact, the statement noted, "The level of human activity at Clark Park and in the surrounding area is so high that the additional activity generated in the long-run by the new facilities will have no significant social impact." The statement also presented the following alternatives to the proposed plan: no action, smaller project, larger project, or same size, other location. The analysis of alternatives concludes that a smaller project or no action would continue the poor conditions preventing high quality recreational use, a larger project would require removal of large numbers of trees and other changes in passive use areas of the park, and that there were no other comparable recreation areas within the area served by the park. The statement also set forth as an adverse impact of the project which "cannot be avoided,"

[V]andalism and property damage beyond that caused by normal use of these recreation facilities is likely to occur.

There is the same probability of theft of personal and public property and the spreading of litter by park users, especially on weekends and holidays. Police surveillance and park supervision can minimize but not totally prevent these actions.

### Injunctive Relief

The merit of Plaintiff's entitlement to injunctive relief turns on the question of whether the Clark Park redevelopment project is a "major federal action signifi-

cantly affecting the quality of the human environment" thus requiring an environmental impact statement prior to funding approval, 42 U.S.C. § 4332.

The applicable test is set forth in *Hanly v. Kleindienst,* 471 F.2d at 830–31.

[I]n deciding whether a major federal action will "significantly" affect the quality of the human environment the agency in charge, although vested with broad discretion, should normally be required to review the proposed action in the light of at least two relevant factors: (1) the extent to which the action will cause adverse environmental effects in excess of those created by existing uses in the area affected by it, and (2) the absolute quantitative adverse environmental effects of the action itself, including the cumulative harm that results from its contribution to existing adverse conditions or uses in the affected area.

The applicable agency regulation (Plaintiff's Exhibit 4) provides that an environmental impact statement will be prepared by the bureau when a project will have "a significant impact on the physical, economic and/or social environment of the project site and/or surrounding area." 650.2.1.4. The guidelines further provide that a statement will be prepared when one or more of several guidelines apply, among which is that: "Public controversy over the environmental effects of the project exists or is expected to manifest itself." 650.1.4.

While Plaintiff's complaint and trial brief focused on the loss of trees, it is apparent from Plaintiff's testimony that the significant impact claimed is the anticipated increased use of the park itself and the activity of youths congregating in the parking lot at night with attendant drinking, drug activity, and litter.

The parties do not disagree that the traditional prerequisites to injunctive relief apply in the environmental context, *Hawthorn Environmental Preserve Association v. Coleman,* 417 F.Supp. 1091 (N.D.Ga.1976), aff'd, 551 F.2d 1055 (5th Cir. 1977) (per curiam), and that Plaintiff has the burden of establishing: (1) irreparable injury, (2)

likelihood of success on the merits, (3) a balance of harm that weighs more heavily on the moving party, and (4) that the public interest will be furthered by the granting of the requested relief.

In considering the likelihood of success on the merits, the Defendants contend that Plaintiff has not sustained its burden in that they have not made a showing that the project involves major federal action under the NEPA or the applicable guidelines. Defendants further contend that even if the project is major, it threatens no significant impact to the environment.

In answer to Defendants contention that the project was not "major" in terms of scope or expenditure and that an EIS was therefore not required, Plaintiff submits that a project need not be both major and have a significant social impact to require an EIS. In the alternative, Plaintiff urges that the project, in fact, is major in terms of time, planning, and expense.

In this connection it is important to note that, regardless of whether or not "major" and "significant" are treated as distinct issues, Plaintiff's burden is to show not only that the agency determination regarding the necessity of an EIS was wrong but also that the decision was arbitrary, capricious, or represented a clear error in judgment. Thus, to satisfy the standard of likelihood of success on the merits, Plaintiff's proofs must show a likelihood that the agency action was not only incorrect but also arbitrary, capricious, or represented a clear error of judgment.

Although neither party has submitted authority on this question from this district or circuit, I conclude that the bifurcated approach is not that most consistent with the purposes of the NEPA. It would appear that if a project has significant impact on the quality of the environment it would come within the broadly protective intent of the Act "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man .... " 42 U.S.C. § 4321, Congressional Declarational of Pur-

pose. Hence, I agree that Plaintiff's burden is to establish a likelihood of success on the merits of the claim that the agency acted arbitrarily in determining that the proposed redevelopment will not have a significant effect on the quality of the human environment, *Mount Vernon Preservation Society v. Clements*, 415 F.Supp. 141 (D.N.H.1976); plaintiff need not show, in addition, that the scope of the project is "major."

While it is anticipated that renovation of the recreation facilities will increase park usage (testimony of Betty Lloyd), Plaintiff did not support with evidence its apparent claim that the park has become (through deterioration) a passive use facility. Indeed, there was ample testimony that the park is presently heavily used and that there is no proposed change in the character of the park. The Court credits the testimony of Mr. Marion May that the predictable change in use of the park will be an increased quality of enjoyment of the facilities; in short, that the park renovation is not a change in use but rather an accomodation to the use the park has historically received which is causing it to "wear out."

■ Moreover, the environmental assessment prepared properly covered each of eight specific points including a statement of adverse environmental effects, possible mitigation of these effects, and alternative proposals. Mitigation of the removal of trees included the planting of substantial numbers of trees and shrubs. Further, the park renovation has no known or suspected environmental impact on unique flora or fauna, archeological or historical values, or permanent impact on air quality, noise levels on nearby residential dwellers, or traffic patterns. In short, I find that Plaintiff has failed to demonstrate a likelihood of success on the claim that the federal Defendant acted arbitrarily or capriciously in concluding that the redevelopment would not significantly affect the quality of the human environment.

■ With regard to Plaintiff's alternative claim that an EIS was required because the parking lot was likely to increase criminal activity among youths congregating there and was therefore likely to be controversial, I note first that the City did comply with the state's requirement to hold a public meeting after publication of notice. Plaintiff cites no authority in support of the contention that the notice was insufficient because it failed to include a parking lot in the published description, and I am unwilling to conclude as a matter of law that a notice must draw attention to every detail of a plan, particularly where, as here, the notice did describe a proposed change in walkways and service areas. What is contemplated by the notice provision is notice which reasonably describes the parameters of the proposal to those who will be effected; precise details of the plan are to be developed at the required meeting.

Assuming arguendo that the notice was defective and that, had notification of the proposed parking lot been given, controversy would have resulted, I cannot conclude either that the addition of the parking lot could be shown to have had a significant impact on the quality of the human environment or that the controversy regarding the parking lot would have required an environmental impact statement.

Congress has not defined the term "controversial." However, courts construing the term have stated that neighborhood protest, however sincere, does not transform an insignificant environmental impact into a significant one. *Mount Vernon Preservation Society v. Clements, supra; Fund for Animals v. Frizzell,* 530 F.2d 982, 988–89 n. 15 (D.C. Cir. 1975).

In *Hanly v. Kleindienst, supra,* the court formulated a definition of "controversial" as referring to cases where a substantial dispute exists as to the size, nature, or effect of a major federal action rather than to the existence of opposition to a use, the effect of which is relatively undisputed. Otherwise stated, if there is no substantial dispute over the size, nature, or effect of the project, controversy over use will not require preparation of an EIS.

In the instant case there is no dispute over the size, nature, or effect of the parking lot. Nor is there dispute as to the potential effect of the use, since the environmental assessment particularly considered increased theft and vandalism and usage of the park at night. What is opposed is the use of a particular portion of the park for on-site parking by a small portion of the potential users of the park, opposition which if recognized as "controversial" would surrender the agency determination that an EIS is unnecessary "[t]o opponents of a major federal action no matter how insignificant its environmental effect when viewed objectively." *Hanly v. Kleindienst, supra* at 830 n. 9A.

Whatever final formulation the term "controversial" or "highly controversial" may take,[3] at the very least it must be understood as requiring actual knowledge of a controversy which would be an indicia that the project would have a significant impact or requiring reasonable foreseeability from the nature or impact of the proposed undertaking that controversy was likely. While the building of a jail in an area where such use does not exist may be predictably controversial, *Hanly v. Kleindienst, supra* at 831, the addition of a comparatively small parking lot in an existing park area has never, according to the testimony of Mr. May, engendered public controversy. This testimony, though not dispositive, is persuasive evidence that the project could not have been expected to be "controversial" as that term is defined in law.

In summary, Plaintiff has failed to demonstrate a likelihood of success on the claim that Defendants acted arbitrarily and capriciously in determining that the addition of the parking lot would not have a significant impact on the quality of the human environment. "N.E.P.A., although rigorous in its requirements, does not require perfection, nor the impossible," *Environmental Defense Fund v. Tennessee Valley Authority,* 492 F.2d 466, 468 n. 1 (6th Cir. 1974).

Alternatively, I conclude that Plaintiff has failed to establish the requisite irreparable harm for injunctive relief.

■ Plaintiff's proofs failed to establish that the park is a passive use facility. The proofs establish that the park is a recreational facility with large areas devoted to passive use. It is not contended that the plan will reduce the size of the passive use area. To conclude that the scheduled renovations would irreparably harm Plaintiff because it would alter the character of the park would be tantamount to holding that because of the park's deterioration Plaintiff has acquired an interest in maintaining a neglected recreation area as a limited use park because of its unattractiveness to others.

With respect to the physical environment, eleven of the twelve trees in question have been removed, and the final tree scheduled for removal is scarred from being struck by maintenance vehicles. Moreover, more than 300 trees and shrubs and 28,800 square feet of new grassy area will be added by the renovation, and the paved parking lot could theoretically be removed and sodded should Plaintiff prevail at trial.

I also have substantial doubt that Plaintiff's speculative predictions of increased annoyance and threat from persons congregating in the lot meets the burden of showing irreparable harm. The proofs establish that the parking lot will not be lighted at night and that after-hours vehicle access to the lot and the park interior will be controlled by barrier gates at the driveways and eight-inch curbs bounding the lot.

The purpose of a preliminary injunction is to preserve the status quo by preventing, during the pendency of the suit, the irreparable harm which the movant alleges will occur. This is not a situation in which it is claimed that permanent defacement of the environment will occur if construction is not halted, *see Environmental Defense Fund v.*

---

**3.** Regulation 650.1 4E of the regulations effective November 30, 1977, (not applicable in this case) rephrases the guideline as follows:

"Highly controversial issues over the environmental effects of the project exist or are expected."

*TVA*, 468 F.2d 1164 (6th Cir. 1972), but rather one in which the injury claimed is paving of the lot and alleged illegal and undesirable activity from young people congregating there. As to this claim, Plaintiff has shown only a fear of remote future injury, *State of New York v. Nuclear Regulatory Com'n*, 550 F.2d 745, 756 (2d Cir. 1977).[4]

For the foregoing reasons the Court concludes that Plaintiff's request for preliminary injunction must be and is hereby DENIED.

IT IS SO ORDERED.

---

4. Plaintiff's claim for preliminary injunctive relief rests wholly on the claimed violation of NEPA. Thus, this opinion does not consider or reach other allegations including the contentions that the renovation violates Michigan statutes and is contrary to the intent of the deed by which the property was conveyed to the City.